No. 47,918

In the Matter of the Application of ALAN EKIS for a Writ of Habeas Corpus, *Petitioner*, v. JOHNNIE DARR, Sheriff of Sedgwick County, Kansas, *Respondent*.

(539 P. 2d 16)

Opinion filed July 17, 1975.

*Orval L. Fisher,* of Wichita, argued the cause and was on the brief for the petitioner.

*Stephen M. Joseph,* assistant district attorney, argued the cause, and *Keith Sanborn,* district attorney, and *Robert L. Kennedy,* assistant district attorney, were with him on the brief for the respondent.

The opinion of the court was delivered by

FOTH, C.: This is an original proceeding in habeas corpus in which the petitioner, Alan Ekis, seeks release from the custody of the Sedgwick county sheriff. He is charged in the district court of that county with six felony charges: aggravated kidnapping, aggravated burglary, robbery, rape, forgery, and attempted forgery. His claim is that the state of Kansas failed to afford him a trial within the time prescribed by the interstate Agreement on Detainers, and thereby lost jurisdiction to try him for his alleged offenses.

The present charges against Ekis were filed in the Sedgwick county court of common pleas and a warrant for his arrest was issued on November 20, 1970. He had fled, and his whereabouts were unknown for almost two years.

In June, 1972, Ekis was arrested in Arizona on charges pending in Illinois and was returned to the latter jurisdiction. On August 21, 1972, he was sentenced to the Menard branch of the Illinois state penitentiary for a two to four year term for theft and felony escape. He was received at Menard on August 24, 1972. In September, 1972, the marshal of the Sedgwick county court of common pleas lodged a detainer for Ekis with the Menard officials. A separate notice was sent to Ekis, notifying him that he was wanted in Kansas.

On October 20, 1972, Ekis delivered to the Menard records clerk a document entitled "Motion for Recall of Detainer and for Dismissal of Outstanding Indictments or, in the Alternative, for a Speedy Trial." In his motion Ekis complained that the Kansas detainer was preventing him from achieving trusty status, and that the delay in bringing him to trial might result in losing the testimony of unnamed but "vitally important" defense witnesses. The delay he complained of was the four month period he had been in custody,

from June to October, 1972. He prayed for dismissal, or in the alternative for a speedy trial. Paragraph 5 of his motion is of particular significance:

"5. No attempt has been made to bring Petitioner to trial on the aforementioned indictments, although petitioner has at all times been available to the State of Kansas for trial. Both Kansas and Illinois are parties to the UNIFORM CRIMINAL EXTRADITION ACT." (Emphasis in the original.)

This document was signed by Ekis, and was notarized by the Menard records clerk on October 20, 1972. Copies were addressed by him to the "Segwick [sic] County Circuit Court" and to the district attorney's office. His attached certificate of service indicates that he requested they be mailed by first class mail.

By letter dated October 24, 1972, the clerk of the court of common pleas acknowledged receipt and filing of the motion. The letter advised Ekis that deputy county attorney David Calvert was assigned to the case, and that Ekis should write to him for further information. It concluded, "If we can be of assistance, please let us know."

On October 27, 1972, deputy county attorney Calvert wrote to Ekis:

"Dear Mr. Ekis:

The State of Illinois and the State of Kansas are both members of the Agreement on Detainers. If you will comply with the Agreement on Detainers and make a request that you be brought back for trial, you will be returned to the State of Kansas for a speedy trial pursuant to law.

Your case will not be dismissed by this office.

Very truly yours,

/s/   David P. Calvert

DAVID P. CALVERT

Deputy County Attorney"

Ekis made no response to the letter from the county attorney's office. His only effort to take advantage of the court clerk's offer of assistance was to ask, in January, 1973, where he could get a copy of "certain chapters of the Kansas Revised Statutes [sic]." His next official step came almost eleven months later, when he filed a second motion to dismiss on September 10, 1973. The same day the Sedgwick county attorney's office made application to secure temporary custody of Ekis for trial under Article IV (a) of the Agreement on Detainers.

At this point Ekis resisted returning to Kansas, both by requesting the governor of Illinois to deny the Kansas request, and by suit in federal court. Kansas instituted extradition proceedings, but these

were held in abeyance pending the federal litigation. On about July 26, 1974, in an unreported decision the United States Court of Appeals for the Tenth Circuit affirmed the district court's decision dismissing the action because of Ekis' failure to exhaust his state remedies. Kansas promptly reinstituted its extradition proceedings, and eventually Ekis waived extradition. He was returned to Kansas on October 2, 1974.

Once here, Ekis in due course moved once again through counsel to dismiss the complaint against him, claiming denial of a speedy trial. The court of common pleas conducted a hearing on the motion at which Ekis testified. That court concluded it had no jurisdiction to enter an order of dismissal with prejudice, as would be required if the motion should be sustained. Accordingly it certified the question to the district court. There a second hearing was held, with Ekis again testifying. The district court overruled the motion, making the following critical findings:

"As stated in the Agreement on Detainers, the agreement is to be liberally construed so as to effectuate its purposes. By liberally construing the Agreement, it might be held that defendant substantially met the requirements of Article 3 (a) were it not that after being informed of the deficiencies in his request, he chose to ignore them and not see that corrections were made.

"After having been advised by letter from Mr. Calvert that his motion of October 27 [sic], 1972, was deficient and after being advised by the Clerk of the Court of Common Pleas that assistance was available, the defendant sought no advice from either.

"The defendant is in no position to criticize the Illinois authorities and blame their errors and shortcomings for his plight when the means of correcting mistakes were available to him.

"The defendant cannot be heard to say that he has complied or substantially complied with the Agreement on Detainers when he has continually refused to agree with or comply in any way with parts thereof, *i. e.*, Article 3, paragraph (e). The Agreement must be complied with or substantially with in whole and not in part. The defendant has not complied with the provisions of the Agreement on Detainers."

This action followed. We heard the case on the pleadings, exhibits, briefs, and the arguments of counsel. In addition we have before us the original files from the court of common pleas and the district court, and transcripts of the hearings held in both courts.

Petitioner's speedy trial claim has two aspects. The first is based strictly on the interstate Agreement on Detainers, the second on the speedy trial guarantees of the Sixth Amendment and § 10 of our own Bill of Rights. Since his primary argument is directed toward the Agreement we shall deal with that aspect first.

As adopted in this state the Agreement appears as K. S. A. 22-4401 through 22-4408. Article III (part of 22-4401) provides in pertinent part:

"(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty (180) days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint: *Provided,* That for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.

"(b) The written notice and request for final disposition referred to in paragraph (a) hereof shall be given or sent by the prisoner to the warden, commissioner of corrections or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

"(c) The warden, commissioner of corrections or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information or complaint on which the detainer is based.

"(d) Any request for final disposition made by a prisoner pursuant to paragraph (a) hereof shall operate as a request for final disposition of all untried indictments, informations or complaints on the basis of which detainers have been lodged against the prisoner from the state to whose prosecuting official the request for final disposition is specifically directed. The warden, commissioner of corrections or other official having custody of the prisoner shall forthwith notify all appropriate prosecuting officers and courts in the several jurisdictions within the state to which the prisoner's request for final disposition is being sent of the proceeding being initiated by the prisoner. Any notification sent pursuant to this paragraph shall be accompanied by copies of the prisoner's written notice, request, and the certificate. If trial is not had on any indictment, information or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

"(e) Any request for final disposition made by a prisoner pursuant to paragraph (a) hereof shall also be deemed to be a waiver of extradition with

respect to any charge or proceeding contemplated thereby or included therein by reason of paragraph (d) hereof, and a waiver of extradition to the receiving state to serve any sentence there imposed upon him, after completion of his term of imprisonment in the sending state. The request for final disposition shall also constitute a consent by the prisoner to the production of his body in any court where his presence may be required in order to effectuate the purposes of this agreement and a further consent voluntarily to be returned to the original place of imprisonment in accordance with the provisions of this agreement. Nothing in this paragraph shall prevent the imposition of a concurrent sentence if otherwise permitted by law."

In section 22-4402 the term "appropriate court," where a request under the Agreement must be filed, is defined as the district court.

The readily apparent "deficiencies" in Ekis' request, referred to in the district court findings previously quoted, were these:

(1) His motion, addressed to the "circuit court," was filed in the court of common pleas and not in the district court as the Agreement requires. Ekis was aware of this by virtue of the acknowledgment sent him by the clerk. (2) His motion was not accompanied by the required certificate of the Menard officials as to the status of his sentence and his parole eligibility. (3) The motion was mailed by ordinary first class mail, as requested by Ekis, and not by certified or registered mail with return receipt requested, as required by the Agreement. (4) The motion gave no hint that it was meant to be a "notice" and "request for final disposition" under the Agreement. Those terms were not used, and the Agreement was not mentioned. The main thrust of the motion was for dismissal, with the alternative request for a speedy trial tacked on as an apparent afterthought.

A fifth deficiency, the failure to waive extradition, was noted and relied on by the district court, and will be discussed later.

While we have dealt but little with the Agreement on Detainers we have had numerous cases arising under the Uniform Mandatory Disposition of Detainers Act, K. S. A. 22-4301 et seq. In State v. Dolack, 216 Kan. 622, 533 P. 2d 1282, we recognized the parallel between the two acts, with the Detainers Act applying to prisoners within the state and the Agreement to those in foreign institutions. In Dolack we reiterated that "To obtain a speedy trial guaranteed by Section 10 of our Bill of Rights, as legislatively defined by either of the two Acts just referred to, it is incumbent upon an accused incarcerated in a penal institution to comply with all the provisions of the Act applicable to his incarceration." (p. 634.) Thus, a

prisoner may not invoke the strict 180 day limitation of either act if, for example, he sends his motion to the wrong court (*Brimer v. State*, 195 Kan. 107, 402 P. 2d 789), or serves the prosecutor but fails to send a copy to the court (*State v. Otero*, 210 Kan. 530, 502 P. 2d 763), or files in the proper court but fails to serve the prosecutor (*Townsend v. State*, 215 Kan. 485, 524 P. 2d 758).

The first four deficiencies in Ekis' original motion might be regarded as somewhat technical. But, as the district court observed, "By liberally construing the Agreement, it might be held that defendant substantially met the requirements of Article 3 (a) were it not that after being informed of the deficiencies in his request, he chose to ignore them and not see that corrections were made." We think it significant that Ekis took no further steps to clarify his position, either by instituting a new, formally correct proceeding or by correcting the deficiencies in the one already started. (We note that Article III [*d*] of the Agreement speaks of the notice and request as a "proceeding being initiated by the prisoner.") His failure to act in response to the Calvert letter is readily susceptible to an inference that he was ambushing the Kansas authorities. He wanted his demand to be on file, but didn't want anyone to know it was a proceeding under the Agreement.

From the prosecution's point of view it was vitally important to know whether or not Ekis was proceeding under the Agreement. If he was, not only did the 180 days begin to run but, more importantly, his request would have had the effect under Article III (*e*) of waiving extradition. Ekis' motion, besides lacking the usual trappings of an "Agreement" request such as restricted mail and the prison official's certificate, appeared to *demand* that Kansas extradite him. Indeed, in his motion he heavily emphasized his reference to the Uniform Extradition Act. There was certainly nothing in the motion remotely approaching a *waiver* of extradition. Had Kansas attempted to secure Ekis' presence without extradition, in reliance on a purported waiver under the Agreement, Ekis might well have resisted and persuasively argued that his motion did not constitute a waiver because it was *not* made under the Agreement. This was the gist of the district court's finding in the last paragraph quoted above that "he has continually refused to agree with or comply in any way with parts thereof, *i. e.*, Article 3, paragraph (e)."

We conclude that the Kansas officials were justified in treating Ekis' first motion as just what it was, *i. e.*, a motion for dismissal

or in the alternative for a speedy trial. As will be discussed later, it carries some weight in determining whether he was denied a speedy trial in the constitutional sense, but it was not a notice and request under the Agreement.

Although now urging that he substantially complied, Ekis testified before the district court that at the time he prepared and filed his motion he had never heard of the Agreement on Detainers. This factor distinguishes the present case from those cited by the petitioner in which it was held that a good faith effort by a prisoner to proceed under the Agreement is all that is required of him. See, *People v. Esposito*, 37 Misc. 2d 386, 238 N. Y. S. 2d 460; *People v. Masselli*, 17 A. D. 2d 367, 234 N. Y. S. 2d 929; *Pittman v. State*, 301 A. 2d 509 (Del.); *State v. Lippolis.*, 101 N. J. Super. 435, 244 A. 2d 531. In each of those cases it was held that where a prisoner made known to the officials his intent to proceed under the Agreement, their subsequent failure to comply with the act could not frustrate his rights. The burden of their failure was visited, and rightly so, on the prosecution.

Here, of course, Ekis gave no indication to the Menard officials that he wished to proceed under the Agreement; according to him, he did not then know of the existence of the agreement. Just when he became familiar with it we cannot tell. We do know that in September, 1973, he availed himself of the provisions of Article IV (*e*) to move the governor of Illinois to disapprove the Kansas request for custody. But when he delivered his original motion for mailing he did not request the prison officials to attach the necessary certificates, to send the motion to the right court, to use restricted mail, or even in general terms to "do what was necessary." On the contrary, he specifically requested mailing to the addressees he chose and the use of ordinary first class mail. While it may be suggested that the Menard records clerk should have advised Ekis how to comply with the Agreement, we do not see that any such obligation rested on him *at that time*. The Agreement (Art. III [*c*]) requires the prison officials to advise an inmate of the existence of a detainer and of his right to make a request for final disposition. (The record does not disclose whether or not that was done.) If an inmate expresses a desire to take advantage of the Agreement the officials have a duty to assist him. They have no general duty to render unsolicited legal advice on an inmate's litigation not connected with a proceeding under the Agreement.

But even assuming the records clerk was derelict in his duty to advise Ekis, we do not think Ekis can claim any advantage from such delinquency. Whether or not Ekis knew of the Agreement when he filed his motion of October 20, 1972, within two weeks he had received the Calvert letter of October 27, 1972. That letter apprised him of the existence of the Agreement and that, in the view of the prosecutor in charge of his case, his motion did not comply. It would have taken very little effort on Ekis' part to ascertain and cure the deficiencies in his motion, but he chose not to do so. He cannot, under these circumstances, allege "substantial compliance" with the Agreement.

Ekis attempts to explain his inaction by saying that he relied on advice given to him by the assistant warden at Menard, a Mr. Sympson. He tells inconsistent stories as to how this advice was given to him. Before the court of common pleas he testified that after receiving the Calvert letter he was unable to get in touch with the records clerk so he asked for an interview with the warden:

". . . I was called before the Warden. I informed him—I took a copy of Mr. Calvert's letter with me and informed him what had happened. I asked him if there was a deficiency, what it was. He stated that [the record clerk] had signed my motion, in other words, and mailed it to the State of Kansas. That was all I needed. That was complying with the law. All I needed to do was wait to be brought back to trial."

Before the district court, on direct examination, he repeated his story about the interview in the warden's office after being called in. On cross-examination, however, the "interview" was put in a different setting:

"Q. Now, after you got back your letter from Mr. Calvert, which has been admitted as Defendant's Exhibit B, you testified you did everything you could to follow up on your request. Tell me in detail what did you do.

"A. When I received a letter from Mr. Calvert, I placed an interview request with the assistant warden, Mr. Sympson. I approached Mr. Sympson —*I never did get a call for the interview—I approached Mr. Sympson in the yard while he was making his rounds and I explained the circumstances.* I even produced the letter from Mr. Calvert.

"Q. In any event you had a talk with Mr. Sympson?

"A. Yes.

"Q. What did you do after that?

"A. After I received the word from Mr. Sympson, I did nothing.

"Q. And why was it that you did nothing?

. . . .

"A. That Mr. Sympson informed me if [the records clerk] received and notarized my request and mailed it to the State of Kansas, that was sufficient. For me to wait for Kansas authorities for a speedy trial." (Emphasis added.)

We are inclined to believe this latest version of the "interview," since Ekis would have no reason to fabricate such a story if it did not happen that way. The earlier, twice-told version—of an office interview, pre-arranged, with the Calvert letter in hand and his prison file available to the warden—is the more self-serving. The later version, spontaneously put forward, casts grave doubt on the validity, if not the very existence, of the warden's advice. At a chance encounter in the prison yard Ekis might possibly have had the Calvert letter in his pocket, but the warden certainly did not have an opportunity to look at his file to determine whether Ekis had made a valid request under the Agreement. The warden might even have assured Ekis that a duly notarized request was all that a prisoner was required to submit, assuming that if it was a request under the Agreement the records clerk would take care of the rest of the formalities. He would have no way of knowing that the document Ekis was referring to was not in form or in contemplation a request under the Agreement.

In any event, whether Ekis received the purported advice or not, it was the offhand advice of a layman. We do not believe he was entitled, on the basis of such advice, to ignore the Calvert letter and assume that the prosecutor didn't know what the law required. A simple letter to Calvert would have enlightened him. We therefore hold that petitioner cannot rely on the Agreement on Detainers because of his failure to comply with its terms, either literally or in substance.

There remains the question of whether Ekis was denied a speedy trial in the constitutional sense. Although his petition raises the issue, petitioner doesn't argue it with any great vigor. He concedes that any delay since September 10, 1973, is not chargeable to the state because he has since that date been using every resource available to keep from being brought to trial. Further, the time from the offenses in late 1970 to mid-1972 cannot be considered because he was a fugitive. The question then is whether the fourteen month period from his arrest in June, 1972, to the state's application for temporary custody in September, 1973, is such an inordinate delay as to deny him the constitutionally guaranteed speedy trial.

In *State v. Otero*, 210 Kan. 530, 502 P. 2d 763, we reviewed the leading authorities on the subject and held:

"A defendant's right to a speedy trial cannot be established by any fixed inflexible rule but is to be determined by the balancing of a number of

factors in which the conduct of both prosecution and defendant is weighed." (Syl. ¶ 2.)

That holding was based in large part on *Barker v. Wingo,* 407 U. S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182, which set out the "balancing" test to be applied and mentioned the four primary factors to be weighed: Length of the delay, reason for the delay, the defendant's assertion of his rights, and prejudice resulting to the defendant.

Looking at those four factors in this case we cannot say Ekis has been denied a speedy trial. The fourteen month period in itself is not excessive—our statute of limitation is two years. And see, e. g., *State v. Brooks,* 206 Kan. 418, 479 P. 2d 893 (seventeen months); *State v. Stanphill,* 206 Kan. 612, 481 P. 2d 998 (thirty-nine months). The reason for the delay is, of course, the fact of his incarceration in another state. While the state was required to act with reasonable diligence, we think in this case the Kansas officials were reasonable in their expectation that Ekis would make the next move. (Compare, *State v. Dolack,* supra.) When he did make a further move, the state acted the same day. As to his "assertion of his rights," his demand was at best ambiguous. While he said he wished to be tried, he didn't waive extradition in his motion and declined to enter such a waiver by a formal proceeding under the Agreement. The state promptly offered him a speedy trial if he would comply with the Agreement, and attempted within eleven months to give him one even without compliance. His demand weighs in his favor, but not very heavily. Finally, Ekis makes no showing of prejudice resulting from the delay. In none of his motions, pleadings, exhibits or testimony does he suggest any witness or other evidence which has become inaccessible to him. Any claim of prejudice must be based on pure speculation. Applying the balancing test of *Barker v. Wingo* we have no hesitation in finding that petitioner has not been denied a speedy trial.

Petitioner has not demonstrated a lack of jurisdiction in the Sedgwick county district court or that his custody by the respondent sheriff is unlawful. The writ prayed for is therefore denied.

APPROVED BY THE COURT.

FROMME, J., not participating.