THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
GARY L. DAILY, Defendant-Appellee.

Fifth District   No. 75-512

Opinion filed February 24, 1977.

Nicholas G. Byron, State's Attorney, of Edwardsville (Bruce D. Irish and Robert J. Anderson, both of Illinois State's Attorneys Association, of counsel), for the People.

Michael J. Rosborough and John H. Reid, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

Mr. PRESIDING JUSTICE CARTER delivered the opinion of the court:

The State appeals from an order of the Circuit Court of Madison County dismissing the indictment against the defendant under the speedy trial provisions of the Interstate Agreement on Detainers (hereinafter termed Agreement). The Agreement was adopted by Illinois in 1971 and its nine articles are codified in section 3—8—9 of the Unified Code of Corrections, the Agreement on Detainers, (Ill. Rev. Stat. 1975, ch. 38, par.

1003—8—9). Article III of the Agreement requires that the defendant be brought to trial within 180 days after he has complied with its provisions. The trial court found that the defendant substantially complied with the Agreement, was not tried within 180 days, and therefore dismissed the indictment.

Gary Daily, the defendant, was charged on June 27, 1974, by indictment with escape and armed robbery in Madison County. His whereabouts were unknown until he was arrested in California on charges of armed robbery. The California law enforcement authorities on October 3, 1974, notified the Madison County sheriff's office that the defendant would be available to Illinois for extradition subsequent to the disposition of the California charges. On the same day, the defendant wrote to the clerk of the circuit court at Edwardsville, Illinois (Madison County), requesting information about outstanding warrants and that the letter be treated as a petition *pro se* for a "fast and speedy trial." The letter was filed October 11, 1974, by the clerk of the circuit court, and a copy was forwarded to the State's Attorney's office and the office of the Public Defender. The circuit clerk's office responded to the defendant's letter, but it was returned undelivered.

An Assistant State's Attorney on October 11, 1974, wrote to the defendant indicating that a speedy trial could be obtained providing the provisions of the Agreement were satisfied. The letter directed the defendant's attention to section 3—8—9, article III, of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1003—8—9, art. III) and noted that he had to be sentenced in California, his request must be accompanied by the proper certificates, and extradition must be waived.

Apparently heeding this advice, on February 14, 1975, six days after the defendant's conviction in California, the clerk of the circuit court received and filed two letters from the defendant. The cover letter requested the clerk to file as a "legal document" and attached letter addressed to the Madison County State's Attorney's Office. In the attached letter, the defendant acknowledged the State's Attorney's letter of October 11, 1974, and attempted to comply with the provisions of the Agreement by making a demand for a speedy trial and waiving the "right to fight extradition." The defendant also requested that if his letter did not satisfy the Agreement's requirements would he please be so notified as promptly as possible. Copies of these letters were never received by the State's Attorney's Office.

On May 14, 1975, again attempting to comply with the Agreement, the defendant sent to the circuit clerk a "Request for Disposition of Indictments, Informations, or Complaints." The "Request" contained references to the Agreement, in which the defendant demanded a speedy

trial, waived extradition, and consented to the production of his body wherever necessary in order to effectuate the purposes of the Agreement. A copy of this letter was never received by the State's Attorney's office.

On August 6, 1975, the circuit clerk filed a "Notice of Place of Imprisonment and Request for Disposition of Indictments" together with an offer to deliver temporary custody of the defendant and a certificate of inmate status. Both the offer and the certificate were signed by the San Quentin California State Prison Records Officer. The State's Attorney's office received copies of these documents, and shortly thereafter the defendant was returned to Madison County.

The defendant was arraigned in the Circuit Court of Madison County, September 10, 1975, pleading not guilty to both counts of the indictment. The defendant filed a petition for discharge on September 24, 1975, arguing his right to a speedy trial was denied due to the State's failure to bring him to trial within the statutory period after he had formally complied with the Agreement.[1] The trial court, ruling on this petition, dismissed the indictment holding that the defendant's letter of February 14, 1975, was sufficient notice to Madison County authorities to activate the 180-day dismissal sanction provided under the Agreement.

■■ No judicial interpretations of the Agreement have been made before in Illinois. Therefore, in construing the statute we must look for guidance from its plain language as well as from precedents of other jurisdictions. Before considering the merits of the case, the background and context of the Agreement are outlined to assist in its understanding.

■■ The Agreement had been adopted by 28 States before Congress in 1970 adopted it as Federal law. Since then, the District of Columbia and all of the remaining States with the exception of Alabama, Alaska, Mississippi, and Oklahoma have adopted the Agreement. The Agreement was enacted to promote expeditious and orderly disposition of outstanding charges against a prisoner and to determine the status of detainers lodged against prisoners in party State institutions. (*Rockmore v. State,* 21 Ariz. App. 388, 519 P.2d 877 (1974); *Baker v. Schubin,* 72 Misc. 2d 413, 339 N.Y.S.2d 360 (1972); *Hoss v. State,* 13 Md. App. 404, 283 A.2d 629 (1971), *rev'd,* 266 Md. 136, 292 A.2d 48 (1972).) A primary reason for the Agreement was to remedy an unfortunate situation caused by States lodging detainers against prisoners and then waiting until their release before instituting action upon the indictments. The necessary result of this practice severely impeded potential rehabilitation for those prisoners laboring under the threat of untried indictments who never knew when, if ever, detaining jurisdictions would cease to toss him from one jurisdiction

---

[1] The statutory period is 180 days; however, under article IV(c) for "good cause shown in open court ° ° ° any necessary or reasonable continuance" may be ordered by the court.

to another. *State v. Wood,* 241 N.W.2d 8 (Iowa 1976); *United States ex rel. Esola v. Groomes* (3d Cir. 1975), 520 F.2d 830.[2]

■■ Upon receipt by the proper authorities of the prisoner's request for final disposition of any outstanding detainers, article III of the Agreement forces those jurisdictions who lodged the detainer to bring the prisoner to trial within 180 days or to be barred permanently. (*Commonwealth v. Fisher,* 451 Pa. 102, 301 A.2d 605 (1973).) The rationale behind the 180-day statutory period is stated in *State v. Lippolis,* 101 N.J. Super. 435, 244 A.2d 531 (1968), *aff'd,* 107 N.J. Super. 137, 257 A.2d 705 (1969), *rev'd on other grounds,* 55 N.J. 354, 262 A.2d 203 (1970):

> "It is appropriate to remind ourselves of the serious disavantages of prisoners serving a term in one state but under detainer for untried indictments of another. * * * The Legislature adopted the dismissal sanction not because a prisoner would be prejudiced at trial if trial were delayed more than 180 days after demand but because such a sanction for failure to try defendant within a fixed, reasonable period of time after demand, was regarded as essential to produce general compliance with the statutory mandate. The sanction is a prophylactic measure to induce compliance in the generality of cases." (107 N.J. Super. 137, 144-45, 257 A.2d 705, 709-10.)

Strict compliance with the 180-day sanction creates no intolerable hardship for prosecutors for they may, under proper circumstances, make requests for continuances. Absent a continuance, the mandatory language of the statute requires dismissal with prejudice once the 180-day period has expired without trial. *State v. Mason,* 90 N.J. Super. 464, 218 A.2d 158 (1966).

The machinery of the statute may be activated by either the State or a prisoner. (*Hystad v. Rhay,* 533 P.2d 409 (Wash. App. 1975); *State v. Brockington,* 89 N.J. Super. 423, 215 A.2d 362 (1965).) Article III(a) allows the prisoner to initiate the request for final disposition on untried indictments, informations or complaints which form the underlying criminal basis for the detainer. Article III(a) provides, in part, that:

> "Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been

---

[2] Concerning the adverse consequences suffered by prisoners and the criminal justice system which are promoted by the use of detainers see *Smith v. Hooey,* 393 U.S. 373, 378-80, 21 L. Ed. 2d 607, 611-12, 89 S. Ct. 575 (1969); *State v. Barnes,* 273 Md. 195, 328 A.2d 737, 743 (1974); D. Wexler & R. Hershey, *Criminal Detainers in a Nutshell,* 7 Crim. L. Bull. 753 (Nov. 1971); E. Dauber, *Reforming the Detainer System,* 7 Crim. L. Bull. 669 (Oct. 1971).

lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint: * * * The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner." (Ill. Rev. Stat. 1975, ch. 38, par. 1003—8—9, art. III(a).)

Article III(c) requires the warden or official having custody of the prisoner to promptly inform the prisoner of the source and contents of any untried detainer and of his right to request their final disposition. The duty to fully inform the prisoner of this information constitutes a necessary concomitant to the effective operation of the statute.

Detailing the second method of disposing of untried detainers, article IV(a) allows the prosecuting authority in another jurisdiction to request final disposition of any untried indictment, complaint or information. If the prosecuting official initiates the request, article IV(d) preserves the prisoner's right to contest the legality of his delivery. Upon the prisoner's arrival in the receiving State, article IV(c) dictates that his trial must commence within 120 days, unless good cause is shown for continuance. Absent good cause for continuance, article V(c) requires the same sanction—dismissal with prejudice—as found when the prisoner initiates the procedure.

Of primary importance to the case at hand is the procedure in which the prisoner starts the statutory machinery. The provisions of the Agreement apply only when a detainer has been lodged against a prisoner who has entered a term of imprisonment in a party State. (*Seymour v. State*, 21 Ariz. App. 12, 515 P.2d 39 (1973); *People v. Butcher*, 46 Mich. App. 40, 207 N.W.2d 430 (1973).) The Agreement does not provide relief for those accused of a crime in another jurisdiction and incarcerated in a party State when no detainer has been lodged. (*State v. Wood*, 241 N.W.2d 8 (Iowa 1976).) Although the agreement does not define the term "detainer" the court in *United States ex rel. Esola v. Groomes* (3d Cir. 1975), 520 F.2d 830, 838, adopts the following definition: " 'a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.' "

■■ An examination of the record does not disclose precisely when a

detainer was lodged; however, as early as October 3, 1974, Californian law enforcement authorities were corresponding with Illinois authorities regarding the defendant's criminal status and extradition. On October 3, 1974, the Los Angeles sheriff's department informed the sheriff of Madison County that it was treating the Illinois warrant as a detainer. Plainly, the Agreement's most fundamental requirement was satisfied. It remains to be seen, however, if the other requirements were met.

In order for the 180-day sanction to discharge the indictment against the defendant, his letter of February 14, 1975, must qualify as sufficient notification to trigger the running of the Agreement's "statute of limitations." The letter of October 11, 1974, fails to qualify because the defendant had not been sentenced in California. As stated above, the Agreement applies only after a detainer has been lodged and the person has entered a term of imprisonment. In examining the sufficiency of the February 14, 1975, letter, attention must be paid not only to its contents, but to the procedure specified in the Agreement as well.

■■ A prisoner's written notice and request for final disposition of any outstanding indictment must, under article III(b), be given or sent to the warden or official having custody of him. The warden or official is then required to promptly forward the request, together with the certificate described in article III(a), to the appropriate prosecuting official and court by registered mail, return receipt requested. (*State v. Brockington*, 89 N.J. Super. 423, 215 A.2d 362 (1965).) The legislature placed the burden of sending the appropriate forms to their proper destination on the warden in order to relieve the prisoner of an onerous task. The court in *Pittman v. State*, 301 A.2d 509, 514 (Del. 1973), noted that "the burden of compliance with the procedural requirements of the IAD [Agreement] rests upon the party states and their agents; the prisoner, who is to benefit by this statute, is not to be held accountable for official administrative errors which deprive him of that benefit." Although the preceding quote would seem to cover the case at the bar, as counsel for the defendant argues, because of fundamental factual differences, it does not. In construing the Agreement, courts have applied this philosophy only to those cases in which the prisoner has been unable to comply with the notice requirement, not by fault of his own, but because of the prosecutor's or custodial personnel's failure to give notice of untried outstanding charges or in failing or refusing to further the prisoner's request. *State v. Brockington*, 89 N.J. Super. 423, 215 A.2d 362, 365-66 (1965). See *Nelms v. State*, 532 S.W.2d 923 (Tenn. 1976) (where the Iowa authorities negligently failed to provide Tennessee authorities with an offer of temporary custody of the prisoner); *Rockmore v. State*, 21 Ariz. App. 388, 519 P.2d 877 (1974) (where prison officials of the sending State failed to send the appropriate certificate described in article III[a]);

*Pittman v. State,* 301 A.2d 509 (Del. 1973) (where Maryland prison authorities refused to forward the proper forms to Delaware); *People v. Parker,* 21 Mich. App. 399, 175 N.W.2d 879 (1970) (where the prosecutor failed to notify the prison officials of the untried outstanding charge against the prisoner); *People v. Esposito,* 37 Misc. 2d 386, 238 N.Y.S.2d 460 (1960) (where the warden failed to follow statutory procedure and the district attorney failed to bring the prisoner to trial after notice).

■■ In all of the above cases, the courts did not require strict compliance with the Agreement, but only required a good faith, diligent effort by the prisoner to invoke the statute. This position recognizes that the inmate-prisoner has no supervisory ability or control over the performance of the law enforcement officials involved with the mechanics of the Agreement. (*State v. Lippolis,* 101 N.J. Super. 435, 244 A.2d 531, 536 (1968).) Thus, under article III(b), all that is required of the prisoner is to give or send written notice to the official having custody of him. (*Rockmore v. State,* at 879; *Pittman v. State,* at 512.) Upon following this procedure, subsequent adverse consequences caused by oversights of law enforcement officials do not inure to the detriment of the prisoner, but must be borne by the officials. (*People v. Masselli,* at 933.) With this consequence acting as inspiration, the correctional authorities should be more conscientious in the performance of their duties imposed upon them by statute. *Nelms v. State,* at 927.

Unlike the above cases, whenever the prisoner does not rely upon the official having custody of him or simply ignores the official altogether and attempts to communicate directly with the requesting State, the burden of omission no longer rests upon the sovereign, but must be shouldered by the prisoner. (*Beebe v. State,* 346 A.2d 169 (Del. 1975); *Ekis v. Darr,* 217 Kan. 817, 539 P.2d 16 (1975); *State v. Savage,* 522 S.W.2d 144 (Mo. App. 1975); *State v. Brockington,* 89 N.J. Super. 423, 215 A.2d 362 (1965).) At first glance, this position might seem incongruous, especially since it has been repeatedly held that the purpose of the statute is remedial and even if it is construed strictly, it must be done so in favor of prisoners within its purview. (*Pittman v. State,* 301 A.2d 509, 512-13 (Del. 1973); *State v. Mason,* 90 N.J. Super. 464, 218 A.2d 158, 161-62 (1966); *People v. Esposito,* 37 Misc.2d 386, 238 N.Y.S.2d 460, 465-66 (1960).) Despite the apparent contradiction, the burden of noncompliance with the mandatory requirements of the Agreement is placed upon the prisoner whenever he or she proceeds *pro se* for a number of sound reasons.

The primary reason for placing the burden on the prisoner falls under the rationale that if you play the game, you must follow the rules. Specifically, as noted earlier, article III(b) requires only that the prisoner give or send to his warden written notice manifesting his intent to comply with the Agreement. Thereafter, the burden of compliance falls entirely

upon the respective officials involved. (*People v. Esposito*, at 467.) But when the prisoner seeks to invoke the statute by means other than those unambiguously outlined therein, and such action is not the result of mistake or misguidance by the officials involved, the prisoner must then comply with the requirements of the Agreement to obtain its benefits. (*State v. Savage*, 522 S.W.2d 144, 148 (Mo. App. 1975).) If the prisoner neglects to follow the statutory procedures and the liberal interpretation rule of article IX is applied, the court's underlying feat is that such "interpretation of the statute would reduce the notice and certificate requirements of article III to a nullity and would attribute to our Legislature and to the signatory states a meaningless act in articulating the statutory requirements." *State v. Brockington*, 89 N.J. Super. 423, 215 A.2d 362, 366 (1965).

Another concern of the courts in requiring strict compliance when the prisoner proceeds *pro se* involves the justifiable fear that the prisoner might be manipulating the statute "to frustrate the effort of the prosecution to give him the benefit of that very provision." (*State v. Masselli*, 43 N.J. 1, 202 A.2d 415, 421 (1964).) In *Ekis v. Darr*, 217 Kan. 817, 539 P.2d 16, 22 (1975), the failure of the prisoner to comply with statutory procedure, especially after being informed of the demand's deficiencies, lead to the inference that the prisoner was "ambushing" the authorities. Clearly, the letter from the prisoner informing the authorities of his desire to comply with the statute must be straightforward and unambiguous so as to leave no doubt in the prosecuting attorney's mind of the prisoner's intent.

Another reason for insistence upon following statutory procedure is to provide the requesting State with the certificate detailed in article III(a). The court in *Isaacs v. State*, 31 Md. App. 604, 358 A.2d 273, 277-78 (1976), refused to apply the liberal construction rule of article IX "to bend the legislation out of shape or to remold it to some other form" when the prisoner, proceeding *pro se,* failed to send a certificate along with his request. The court viewed the certificate as an indispensable element under the statute. The certificate serves to fully inform the requesting State officials of the prisoner's status, thus allowing the State's Attorney to make a rational decision regarding the disposition of the case. The absence of the certificate has been held fatal to the prisoner's request. *State v. Savage* at 147.

Together with the requirement for delivery of the certificate, article III(a) necessitates delivery of the prisoner's request for final disposition of untried criminal charges pending in courts of another state to both the prosecuting officer *and* the appropriate court of the prosecuting officer's jurisdiction. See *Beebe v. State*, 346 A.2d 169 (Del. 1975) (where the prisoner's letter to the "Clerk of the Circuit Courthouse" did not satisfy

the delivery requirements of the Agreement); *Ekis v. Darr*, 217 Kan. 817, 539 P.2d 16, 21 (1975) (where notice was sent to the wrong court); *State v. Savage,* at 147 (where the request was mailed to the wrong prosecuting official).

■■ Both case history and the plain language of the statute require the sending of written notice to the appropriate court as well as to the prosecuting official. In the case at hand, defendant's letter of February 14, 1975, was received by the appropriate court; however, no letter was mailed to the prosecuting official. The cover letter (addressed to the circuit clerk) did not request that the attached letter be forwarded to the State's Attorney, but merely asked that it be "filed as a legal document." If the prosecutor had actual knowledge of the defendant's February 14 request, our holding might have been different. The requirement of sending written notice to both the appropriate court and to the prosecuting official is not satisfied by the mere filing of the February 14, 1975, letter in the Madison County Circuit Court. In facing a similar problem, the court in *Baker v. Schubin,* 72 Misc. 2d 413; 339 N.Y.S.2d 360, 370 (1972), noted that:

> "Here it is patent that the petitioner did not mail the statutory notice 'to the prosecuting officer' (CPL §580.20, art III[a]). Indeed, had such notice been sent the prosecuting officer could have requested temporary custody and petitioner's presence in the Massachusetts courts and there obtained a continuance [citation]. The Commonwealth's rights in matters of this nature are no less than those of the petitioner. The prosecuting officer is entitled to notice and received none. It may be argued that if the Chief Clerk of the Ossining Correctional Facility had performed his duty, the defect would have been cured. The argument is appealing but not persuasive. No such notice was ever given and the petitioner's failure to comply with the statutory mandate cannot be excused."

Although the defendant's letter clearly manifested his intent to comply with the Agreement, no letter was sent directly to the prosecuting attorney. The only possible explanation for this fatal error could be the defendant's reliance upon the circuit clerk to forward a copy of the letter as was done with the defendant's letter of October 3, 1974 (his first letter to Madison County requesting a speedy trial). Because of the explicit language in the statute and since the defendant knew the State's Attorney's office address (it was on the letter the circuit clerk filed), we believe the defendant's reliance upon the circuit clerk to forward his letter was unreasonable.

Together with the defendant's failure to comply with the notice requirement, his letter of February 14, 1975, did not contain the certificate specified in article III(a). Even though the letter requested that he be

informed promptly should it not satisfy the Agreement, such reliance was unreasonable and misplaced. Not until the defendant has substantially complied with all of the terms of the statute can he justifiably rely upon the sufficiency of his notice. Consequently, the defendant must comply with all of the statutory requirements before judicial relief may be had. Needless to say, once Californian authorities sent the required certificate and information to the proper Illinois authorities, the defendant was rapidly returned to Illinois for trial.

For the foregoing reasons, we hold that the defendant's letter of February 14, 1975, did not satisfy the notice and delivery requirements specified under the Agreement and therefore could not trigger the running of the 180-day dismissal sanction on that day. Since the defendant was brought to trial well within 180 days subsequent to proper notice, the lower court erred in dismissing the indictment and we must reverse.

The order of the Circuit Court of Madison County dismissing the indictment against the defendant is reversed and the indictment is reinstated.

Order reversed.

JONES and G. MORAN, JJ., concur.