**STATE ex rel. Eric W. SAXTON, Relator,**

v.

**James A. MOORE, Judge of the Circuit Court of Jackson County, Missouri, Sixteenth Judicial Circuit, Division No. 9, Respondent.**

No. WD 31259.

Missouri Court of Appeals,
Western District.

April 7, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 5, 1980.

Application to Transfer Denied
June 10, 1980.

Clifford A. Cohen, Public Defender, Gary L. Gardner, and Kevin R. Locke, Asst. Public Defenders, Kansas City, for relator.

Ralph L. Martin and Robert Frager, Kansas City, for respondent.

ORIGINAL PROCEEDING IN PROHIBITION

Before WASSERSTROM, C. J., and SHANGLER, DIXON, SWOFFORD, TURNAGE, CLARK and KENNEDY, JJ.

KENNEDY, Presiding Judge.

This court upon the petition of relator issued its preliminary writ prohibiting respondent judge from placing relator upon trial upon an information charging relator with first-degree robbery, assault with intent to kill, second-degree burglary and armed criminal action.

We now make absolute the preliminary writ, and direct respondent judge to refrain from further proceeding upon said information except to dismiss the same.

The ultimate issue before us is whether the state delayed placing defendant upon trial beyond the 180-day period allowed by Article III of the Agreement on Detainers to which Missouri is a party, § 222.160, RSMo 1978. If it did delay beyond the 180-day period, as we hold it did, the Agreement on Detainers, Art. V(3) mandates the dismissal of the charge with prejudice.

The record before us shows that relator Eric W. Saxton was a prisoner in the Federal Correctional Institution at El Reno, Oklahoma. He was serving a ten-year sentence upon conviction in the United States District Court before the District of Kansas for "violently taking things of value". A detainer had been lodged against the prisoner based upon an untried complaint then pending in a magistrate court in Jackson County, Missouri. The charge in the complaint is the one, now charged in an information in the Jackson County Circuit Court, upon which respondent judge is threatening to place relator upon trial, and which relator seeks to prevent.

The relator's initiative took the form of a letter to the office of the prosecuting attorney of Jackson County, dated August 7, 1978. We do not know what the letter said, but on September 29 a law intern of the Jackson County prosecuting attorney's office answered the prisoner's letter. The

text of the law intern's letter is copied in the margin.[1]

Saxton then sent three documents to the office of the Jackson County prosecuting attorney, respectively entitled, "Notice of Untried Indictment"; "Notice of Place of Imprisonment and Request for Disposition of Indictments, Information or Complaints"; and "Certificate of Inmate Status". The documents were received by the Jackson County prosecutor's office in Kansas City on December 14, 1978. That they complied with the instructions in the September 29 letter from the prosecutor's office, as it will later be seen, is significant. The first two documents were typed and were signed by Saxton. The third document, the "Certificate of Inmate Status", was on a printed form which was headed by the phrase "Agreement on Detainers" and included a direction that "copies of this form should be attached to all copies of Form II." (Form II is the second of the above documents, the "Notice of Place of Imprisonment and Request for Disposition of Indictments, Information or Complaints".) The "Certificate of Inmate Status" was signed by a representative of the Federal Corrections Institution. Attached to it was another page, headed "Clearing Detainers", which was on a printed form upon which the prisoner could indicate whether he had counsel or wished the court to appoint counsel. It consented to the appointment of counsel by the appropriate court in the receiving state for proceedings in the incarcerating state. This page was signed by Saxton.

All the foregoing documents contained specific references to the Agreement on Detainers and used the Agreement on Detainers vocabulary. They requested a speedy disposition of the detainer based upon the Jackson County charges. That the prisoner was proceeding under the Agreement on Detainers and attempting to avail himself of the benefits of that document, was unmistakable.

The relator's documents were not sent to the court where the charge was pending but only to the Jackson County prosecuting attorney. Article III of the Agreement on Detainers says that the 180-day trial period begins to run when the prisoner "shall have caused [the appropriate notices] to be delivered to the prosecuting officer *and the appropriate court*". The state argues here that the failure to deliver the notice to the appropriate court is fatal to the prisoner's claim that, absent the delivery of the notice to the appropriate court, the 180-day period never did commence to run. It is logical to take note of that issue at this point, although we will defer dealing with it till later in the opinion.

On January 22, 1979, an assistant prosecuting attorney of Jackson County, Mr. Proctor, mailed to the Director of the Federal Correctional Institution a "Prosecutor's Acceptance of Temporary Custody Offered in Connection with a Prisoner's Request for Disposition of a Detainer". This form advised the Director "that I accept temporary custody and that I propose to bring this person to trial on the indictment, information, complaint named in the offer within the time specified in Article III(1) of the Agreement on Detainers". The form stated that temporary custody of Saxton would be received about March 8, 1979.

A Jackson County deputy sheriff went to El Reno on March 8 to get Saxton. He was not permitted to take him from the El Reno prison, though, for the reason that the institution had not made an "offer of custody".

1. The September 29, 1978, letter said, omitting formal parts:

This letter is in response to your correspondence of August 7, 1978, regarding charges pending against you in Jackson County, Missouri. If you wish a disposition of the *charges and the detainer lodged against you*, please complete and send us the following forms in compliance with the Interstate Agreement on Detainers:

Form I—"Notice of Untried Indictment".
Form II—"Inmate's Notice of Place of Imprisonment and Request for Disposition of Indictments, Information or Complaints".
Form III—"Certificate of Inmate Status".
Once we receive these forms we can proceed with respect to the detainer lodged against you.

Mr. Proctor, the assistant prosecuting attorney, testified that without a previous offer of custody the prisoner could not be released. The Jackson County deputy sheriff returned empty-handcuffed. Mr. Proctor acknowledged that no offer of temporary custody had been received from the Federal Corrections Institution at that time, although the prosecutor's acceptance of January 22 referred to an "offer of custody" previously made by the prison officials. (Article V(1) of the Agreement on Detainers provides that the offer of temporary custody should accompany the initial written notice which is to be sent to the prosecuting officer and the appropriate court of the receiving state.)

After the March 8 fiasco, and a lengthy telephone conversation between Mr. Proctor and an official of the El Reno facility, an "offer to deliver temporary custody" was received from the Federal Correctional Institution. It was dated March 13, 1979, and the covering letter was dated March 15, 1979. Mr. Proctor said it was received March 15 "or within a few days thereafter".

Mr. Proctor prepared a new "Prosecutor's Acceptance of Temporary Custody Offered in Connection with the Prisoner's Request for Disposition of a Detainer" and mailed it to the Director of the Federal Corrections Institution. It, too, stated that "I accept temporary custody and that I propose to bring this person to trial on the indictment, information or complaint named in the offer within the times specified in Article III(1) of the Agreement on Detainers".

On July 12, 1979, Jackson County officers transferred Saxton from the El Reno facility to Jackson County for trial.

On September 13 the case came before the respondent Judge Moore upon two motions—a motion to require election of counts and a motion to dismiss based on the Interstate Agreement on Detainers. The court at that time stated that October 22 would probably be the earliest date that the case could actually be tried. The court indicated that relator's motion to dismiss would be overruled but that he would withhold his ruling for a time to allow relator to seek a writ of prohibition.

*Agreement on Detainers, general plan.*

The Agreement, as we shall hereafter call it, declares its purpose to achieve an orderly and expeditious disposition of detainers lodged against prisoners based upon untried indictments, informations and complaints in other party states. It provides a procedure to be initiated either by the prisoner himself, or by the prosecuting officials of the other state, to transfer custody of the prisoner from the place of incarceration to the other state for trial. In the case now before us it was the prisoner who started the procedure. In such a case, the Agreement provides that, should the prosecuting or receiving state not place the prisoner upon trial within 180 days, the indictment, information or complaint is to be dismissed with prejudice. The 180 days begins to run when the prisoner "shall have cause to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint".

The Agreement recites that it is aimed at the difficulties in securing speedy trials of criminal charges when the accused is imprisoned in another state than the one where the charges are pending, and at the uncertainties which obstruct programs for prisoner treatment and rehabilitation. It says that its objective is to provide "cooperative procedures" among party states, in the absence of which proceedings upon the pending charges cannot properly be had. § 222.160, Art. I. It goes on to provide that it shall be "liberally construed so as to effectuate its purposes". § 222.160, Art. IX. The Agreement affords to the prisoner a kind of bankruptcy machinery, by which he can marshal all pending criminal charges for disposition, in a limited space of time, and get his imprisonment obligations settled.

*Substantial or exact compliance required.*

The courts have generally held that the Agreement does not require literal

and exact compliance by the prisoner with the directions of the Agreement in order to avail himself of its benefits. If the prisoner makes a good-faith effort to bring himself within the Agreement's purview, and omits nothing essential to the Agreement's operation, then his failure of strict compliance will not deprive him of its benefits. It is the scheme of the Agreement, as it has been construed by the courts, to place the onus of compliance upon the officials of the incarcerating and receiving states, rather than upon the prisoner. The officials are generally in better position to advance the case and to secure cooperation from each other than is the prisoner. *McQueen v. Wyrich*, 543 S.W.2d 778, 783-4 (Mo. banc 1976) (concurring opinion); *McBride v. United States*, 393 A.2d 123, 128 (D.C.App. 1978); *State v. Seadin*, 593 P.2d 451 (Mont. 1979); *People v. Daily*, 46 Ill.App.3d 195, 4 Ill.Dec. 756, 761-2, 360 N.E.2d 1131, 1136-7 (1977); *State v. Mason*, 90 N.J.Super. 464, 218 A.2d 158 (1966); *People v. Diaz*, 94 Misc.2d 1010, 406 N.Y.S.2d 239 (Sup.Ct. 1978).

*Inception of 180-day trial period.*

We have concluded that the 180-day period of the Agreement was incepted on January 22, 1979. More than 180 days passed without his being placed upon trial upon the accusations pending in Jackson County. He became entitled upon July 23, 1979, to have the case against him dismissed with prejudice.

*Prisoner's attempt at inception of 180-day period.*

That the prisoner in good faith undertook to avail himself of the Agreement's provisions in December, 1978, is abundantly clear. The documents which he sent to the office of the prosecuting attorney of Jackson County, and which arrived there December 14, 1978, by registered mail, had the unmistakable and express purpose of activating the Agreement procedure.

*Prisoner's failure of compliance with Agreement; his self-help in mailing documents to receiving state.*

There are, however, two points at which the relator did not strictly follow the terms of the Agreement. First, the Agreement contemplates that the documents sent in this case by the prisoner to the Missouri authorities are to be sent instead by the incarcerating institution, upon the prisoner's notifying the institution of his desire to avail himself of the Agreement's provisions. § 222.160, Art. III(2, 4). The state does not claim that this requirement is an essential feature of the Agreement, and does not claim that the prisoner is to be deprived of its benefits because he took upon himself to prepare and mail the documents. It does argue, as we shall see, that his attempts at self-help were insufficient. There is no reason to suppose that the State of Missouri or the Federal Correctional Institution was in any way disadvantaged because the documents were sent by and received directly from the prisoner rather than from the Federal Correctional Institution. *State v. Seadin, supra.* Cf. *People v. Jacobs*, 596 P.2d 1187 (Colo. banc 1979); *Beebe v. State*, 346 A.2d 169 (Del.1975); *Davidson v. State*, 18 Md.App. 61, 305 A.2d 474 (1973).

*Prisoner's failure of compliance with Agreement; his failure to notify "appropriate court".*

■ The state emphasizes, though, the second mistake of the prisoner—that is, that he failed to send the documents to "the appropriate court", as the Agreement directs, as well as to the Jackson County prosecuting attorney. Since he did not, the state argues, the 180-day trial period never commenced to run.

There are indeed cases which hold that the notification both of the prosecutor and of the appropriate court is essential if the prisoner is to set running the 180-day trial period. *Hammet v. McKenzie*, 596 S.W.2d 53, 56 (Mo.App.1980); *State v. Bussard*, 494 S.W.2d 401 (Mo.App.1973). This requirement of the statute recognizes a joint responsibility of the prosecutor and of the court to advance cases to trial, and therefore it requires the documents to be sent to both. The prisoner, by omitting this requirement, failed to incept the period by the December 14 documents.

*Waiver by state of notification to "the appropriate court".*

██ The state, however, by its action which we shall hereafter note, waived the requirement that they "appropriate court" be notified. The assistant prosecuting attorney, Mr. Proctor, on January 22, 1979, as we have already seen, prepared the document headed "Agreement on Detainers Form VII" and entitled "Prosecutor's Acceptance of Temporary Custody Offered in Connection with a Prisoner's request for Disposition of a Detainer". It is set out in full in the margin.[2] According to Mr. Proctor's testimony, the document was mailed to the person whose title and address appeared thereon. The document, or a copy thereof, was also received *by the prisoner* in El Reno. It was the prisoner who identified it and offered it for admission into evidence in the hearing on his motion to dismiss.

The document stated that the assistant prosecuting attorney accepted temporary custody of the prisoner. "I propose to bring this person to trial . . . within the time specified in Article III(1) of the Agreement on Detainers", it said, "If agreeable to you, we would like to send our agent to receive temporary custody of Eric W. Saxton on or about March 8, 1979 . . ."

Failing to secure custody of the prisoner on March 8, as earlier described, and after his telephone conversation with Mr. Roach of the Federal Correctional Institution, Mr. Proctor prepared a similar form (omitting the sentence about sending the agent to receive temporary custody) and mailed it to the Director of the Federal Correctional Institution at El Reno. (This second "Prosecutor's Acceptance" is unaccountably dated February 7, 1979). This document, too, or a copy of it, was received by the prisoner in El Reno and was identified by him for admission into evidence.

It is to be noticed that these documents raised no objection to the procedure fol-

2.

AGREEMENT ON DETAINERS FORM VII

PROSECUTOR'S ACCEPTANCE OF TEMPORARY CUSTODY OFFERED
IN CONNECTION WITH A PRISONER'S REQUEST FOR
DISPOSITION OF A DETAINER

TO: Director _____ (Warden, Superintendent, Director)

Federal Correctional _____ (Institution)
   Institution

P.O. Box 1500 _____ (Address)
El Reno, Oklahoma 73036

In response to your letter of __January 14, 1979__, and offer of temporary custody regarding Eric W. Saxton who is presently under indictment, information, complaint in Jackson County, Missouri, of which I am Assistant Prosecuting Attorney, please be advised that I accept temporary custody and that I propose to bring this person to trial on the indictment, information, complaint named in the offer within the time specified in Article III(1) of the Agreement on Detainers.

If agreeable to you, we would like to send our agent to receive temporary custody of Eric W. Saxton on or about __March 8, 1979__. Please reply as to whether this prisoner will be available on that date.

/s/ G. Edwin Proctor, Jr. _____
ASSISTANT PROSECUTING ATTORNEY

I hereby certify that the person whose signature appears above is an appropriate officer within the meaning of Article IV(1) and that the facts recited in this request for temporary custody are correct and that having duly recorded said request I hereby transmit it for action in accordance with its term and the provisions of the Agreement on Detainers.

DATED: __January 22, 1979__

/s/ William J. Marsh _____
JUDGE

lowed by the prisoner. They pointed to no deficiency therein. In particular, they did not say anything about the omission to send the notices to the appropriate court in accordance with the Agreement. They formally declared the prosecutor's acceptance of the prisoner's custody for the purpose of trial, and declared the prosecutor's intention to bring him to trial within the time allowed by the Agreement on Detainers. The prosecutor thus waived the statutory notice to the court, and accepted what the prisoner had done as sufficient to invoke the Agreement on Detainers.

That the state purposefully waived the notice to the court is borne out by earlier (September 29, 1978) letter from the prosecutor's office to the prisoner. The prisoner's procedure, in the documents received by the Jackson County prosecutor's office December 14, 1978, followed its instructions to the letter.

If the prisoner omitted a necessary step, the omission was caused by misdirection or misguidance by the state. *See People v. Daily*, 4 Ill.Dec. at 762, 360 N.E.2d at 1137. We do not mean to say that the misdirection by an official would in all cases by itself excuse the omission by the prisoner of an essential act, but it is a factor which we take into consideration in finding waiver by the state of the requirement of notification of "the appropriate court".

In our judgment the January 22, 1979, "Prosecutor's Acceptance of Temporary Custody Offered in Connection with a Prisoner's Request for Disposition of a Detainer" constituted a waiver of the prisoner's failure to notify "the appropriate court". It set the 180-day period running. *State v. Barnes*, 273 Md. 195, 328 A.2d 737, 746 (Md.App.1974). It is not necessary for us to consider whether the January 22, 1979, or the February 7, 1979, certificate of Circuit Judge Marsh, appended to the prosecutor's acceptance of custody, evidenced actual notice to "the appropriate court" of the prisoner's invocation of the Agreement on Detainers—and, if so, whether that was sufficient compliance even absent the waiver. *See State v. Barnes, supra*, 328 A.2d at 746;

*People v. Daily, supra*, 4 Ill.Dec. at 763, 360 N.E.2d at 1138.

It may be argued that, since the prosecutor and the court were both entitled to receive defendant's request for an early trial, the *prosecutor* could not bind *the court* by his waiver. The proceeding, however, was not a tripartite transaction involving the defendant at one corner, the prosecutor at another, and the court at a third. It was a two-party transaction, with the defendant on one side and the state—represented by the prosecutor, the court and the prisoner's keeper—on the other. The court had no right, personal to itself and separate from the state, to receive the Agreement documents. The prosecutor could, in his dealings with the defendant, assume the authority to waive *for the state*, not for the court, the obligation of the defendant to lodge his speedy trial request with the court. We hold that the prosecutor's office did that.

### Sanction of dismissal of information.

■ The state argues that the defendant was not prejudiced by the failure to bring him to trial within the 180-day period, and that therefore he should not be held entitled to dismissal. The state's argument must be addressed to the legislature and not to the court, for the Agreement on Detainers mandates the dismissal of the charge with prejudice if the defendant is not brought to trial within the 180-day period. It is not incumbent upon the accused, in order to show entitlement to a dismissal, that he show prejudice. *People v. Wilson*, 69 Cal.App.3d 633, 138 Cal.Rptr. 259, 262[3] (1977); *Nelms v. State*, 532 S.W.2d 923, 927 (Tenn.1976).

■ The stringent sanction of dismissal is a prophylactic provision, whose aim is not to give the prisoner a windfall but is to place pressure upon the state to give the incarcerated defendant a speedy trial. *McBride v. United States, supra* at 129[5]; *State v. Barnes, supra* 328 A.2d at 741; *State v. Lippolis*, 107 N.J.Super. 137, 257 A.2d 705 (1969); *State v. Mason, supra*; § 222.160, Art. I. The Agreement does not place the state under undue hardship,

though, for it allows for reasonable continuance if applied for within the 180-day period. *State v. Mason, supra* 218 A.2d at 163; § 222.160, Art. III(1). Our record does not show any application for a continuance.

The preliminary writ is made absolute.

All concur.