No. 46,717

State of Kansas, *Appellee,* v. Frank R. Otero, *Appellant.*

(502 P. 2d 763)

Opinion filed November 4, 1972.

*Jim Lawing,* of Jim Lawing, Chartered, of Wichita, argued the cause and was on the brief for the appellant.

*David P. Calvert,* deputy county attorney, argued the cause, and *Vern Miller,* attorney general, and *Keith Sanborn,* county attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

Fontron, J.: This appeal involves but one issue; the constitutional right to a speedy trial.

On November 13, 1962, a Wichita home was burglarized and valuable items of jewelry were stolen therefrom. On March 12, 1963, charges of burglary and larceny were filed against the defendant, Frank R. Otero, in connection with the break-in.

Sometime in the month of May, 1963, the defendant was picked up in Florida and released to California where he was tried on

charges of conspiring to commit robbery and kidnapping. He was convicted of those charges and was sentenced to serve a term of from one year to life. He is still incarcerated on the California sentence.

In April of 1964, Otero became aware of the charges pending against him in Sedgwick County and requested a copy of the complaint from the county attorney. On being supplied with a copy of the charges against him, the defendant wrote the county attorney demanding that he be returned for trial. This letter was written April 22, 1964, and on April 27 it was received in the county attorney's office where it languished for a substantial number of years.

It is not clear when efforts may have been started to return Otero to Kansas, but it appears from the state's brief that on May 25, 1971, Sedgwick County requested temporary custody of the defendant in order to return him to Kansas for trial. On August 3, 1971, the defendant was released to a Sedgwick County officer who returned him to Kansas. At the time of his preliminary hearing, Otero moved for a dismissal of the charges because of the state's failure to accord him a speedy trial. This motion was overruled and the defendant was bound over for trial. On September 16, 1971, an amended information was filed. Trial was commenced October 18, after a second motion to dismiss the charges had been overruled by the trial court, and the defendant was convicted on both charges. Sentence was pronounced November 29, 1971, after which Otero was returned to California authorities.

The concept of a speedy trial is threaded throughout this nation's entire history. It has been given expression not only in the Sixth Amendment to the Constitution of the United States, but in § 10 of the Bill of Rights of the Kansas Constitution, as well. No constitutional precept is more inviolable, no right of an accused more precious, than that one who is accused of crime be tried promptly and with due dispatch.

No long litany of modern judicial pronouncements focusing on the federal right to a speedy trial is believed to be necessary in this opinion. However, three decisions may properly be noted briely at this time. In *Klopfer v. North Carolina*, 386 U. S. 213, 226, 18 L. Ed. 2d 1, 87 S. Ct. 988, the Federal Supreme Court specifically held that the Sixth Amendment guarantee of the right to a speedy trial was enforceable against the states through the medium of the Fourteenth Amendment, as "one of the most basic rights preserved by our Constitution."

In a somewhat later case, *Smith v. Hooey*, 393 U. S. 374, 383, 21 L. Ed. 2d 607, 89 S. Ct. 575, the high court held that the imprisonment of an accused in a penal institution of one jurisdiction (being a federal penitentiary in that case) did not *per se* deprive him of the right to a speedy trial on charges pending in another jurisdiction but that upon a demand by the accused the state in which the untried charges were pending "had a constitutional duty to make a diligent, good faith effort" to bring the accused before the proper court for trial.

Soon after *Smith* was handed down, the nation's supreme tribunal adhered to the rationale of that decision and in *Dickey v. Florida*, 398 U. S. 30, 38, 26 L. Ed. 2d 26, 90 S. Ct. 1564, the court directed the vacation of a judgment of conviction which had been entered against *Dickey* predicated on charges which had originated some eight years before he was tried. As was true in *Smith*, the petitioner in the *Dickey* case had been held in "durance vile" by federal penal authorities during the long interval which elapsed between the filing of the state charges and their ultimate disposition. As in *Smith*, also, timely demands had been made for a prompt and speedy trial of the charges. In ordering dismissal of the state proceedings, the supreme court tersely observed that no valid reason existed for the delay; that it was exclusively for the convenience of the state; and that on the record the delay, with its consequent prejudice, was "intolerable as a matter of fact and impermissible as a matter of law." A concurring opinion authored by Mr. Justice Brennan delved more deeply into the matter of prejudice.

The most recent pronouncement from the Olympian heights finds its earthly embodiment in the pages of *Barker v. Wingo*, 407 U. S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182, which was decided after the briefs in the instant appeal were filed. In that case the supreme court fathered the thought that there is more than one criterion for determining whether an accused has been deprived of or has been accorded a speedy trial; that the true test rests not alone on the length of time transpiring after charges have been filed or on whether demand for trial has been made. Rather, opined the august court, the approach to the problem is a balancing test in which the conduct of both prosecution and accused is to be weighed. This approach suggests an *ad hoc* basis in which various factors are to be taken into account.

*Baker* identifies four factors entitled to consideration, although the list is obviously not intended to be exclusive: Length of the

delay, reason for the delay, the defendant's assertion of his rights and prejudice resulting to the defendant. A discussion by the court of the four factors named by it is to be found in *Barker* but the same need not be repeated here. The opinion is readily accessible to every reader who may be interested in the reasoning on which the decision rests.

Applying the criteria set forth in *Barker v. Wingo*, supra, for this common sense opinion gives flesh to the rule which we are to follow, this court inclines to the view that the defendant was not accorded his constitutional right to a speedy trial and that his motion for discharge should have been sustained by the trial court.

In the first place, the delay itself was lengthy, extending somewhat more than eight years from the filing of charges to eventual date of trial. Thus it spanned nearly a decade, a far greater time than was the case in either *State v. Stanphill*, 206 Kan. 612, 481 P. 2d 998, or *State v. Brooks*, 206 Kan. 418, 479 P. 2d 893, both cited in the state's brief. We believe, in strict fact, the delay was inordinate.

Secondly, the delay cannot be attributed to the defendant. He did not court delay nor did he assent to any sort of continuance. For seven long years, so far as the record shows, the state simply did nothing to bring the charges to trial; it made no demand upon or inquiry of California authorities concerning the custody of Otero for purposes of trial.

It is quite true that Kansas did not become a party to the Interstate Agreement on Detainers (K. S. A. 1971 Supp. 22-4401) until 1969, when it was adopted by the legislature to become effective July 1 of that year. That compact was "far down the road" when the defendant demanded he be returned for trial, and the procedures set out therein were not available either to him or to the state. But, as we said in *State v. Stanphill*, supra, "A constitutional right is not to be limited or denied simply because of the lack of implementing legislation." (p. 615.)

Moreover, we think it worthy of note that the state exerted no effort to secure the defendant's presence by means of a writ of habeas corpus *ad prosequendum*, a writ well known to the common law, nor did the state attempt to use the avenues available to it under the Agreement on Detainers Act until some eighteen months more or less after the agreement had taken effect. The record is entirely barren of any showing that the state fulfilled its "constitutional duty to make a diligent good faith effort" to bring this defendant before the proper court until some seven years had come

and gone. Under circumstances such as these we are obliged to infer that the delay was for the convenience of the state—not of the defendant.

So far as the defendant's assertion of his rights is concerned, his demand to be returned for trial on the pending charges was clearly and forcefully expressed in the letter he directed to the county attorney on April 22, 1964. The state asserts, however, that the letter was misaddressed; that it should have been dispatched to the court rather than to the prosecutor. We are not unduly impressed by this argument despite the fact that statements to such effect may be found in a few cases.

The defendant's letter was written before Kansas had provided any statutory avenue for a convict imprisoned in another state to request trial on charges pending against him in the courts of this state. Hence the defendant, unlearned as he must have been in the law, had no guidelines to follow in seeking the disposition of criminal charges pending in Kansas. We deem it not surprising that he directed his demand for trial to the county attorney, the public officer whose well known responsibility it is to prosecute offenders against the law and to press their cases before the courts of this state. We cannot fault the defendant for making his demand upon the county attorney, nor do we hold his demand insufficient for that reason.

We must point out, however, that under Article III of the Agreement on Detainers, supra, which now applies in Kansas, a prisoner's written request for final disposition of untried criminal charges pending in the courts of another state must be delivered both to the prosecuting attorney and to *the appropriate court* of the prosecuting officer's jurisdiction.

We pass now to the last of the four factors identified in *Barker* as requiring consideration, namely, prejudice to the defendant. This court has always recognized prejudice as an element of prime importance in speedy trial cases, although it has tended to view prejudice in the context of the accused's ability to defend himself. (*State v. Brooks*, supra; *State v. Stanphill*, supra.)

The record offers no concrete evidence that the long delay in this case hampered the defendant in presenting his defense at the trial. There is nothing to show, for example, that witnesses were dead or could not be located; nothing to suggest that records had been destroyed or had come up missing. Nonetheless we cannot say the element of prejudice is entirely missing in this case. It is increasingly

being recognized in this modern age that the impairment of a defendant's capacity to conduct his defense is only one form of prejudice which may flow from long delay in bringing charges to trial. Justice Brennan, concurring in *Dickey v. Florida*, supra, makes this point clear on page 54 by quoting from *United States v. Mann*, 291 F. Supp. 268, 271:

". . . '[P]rejudice may fairly be presumed simply because everyone knows that memories fade, evidence is lost, *and the burden of anxiety upon any criminal defendant increases with the passing months and years'* . . ." (Emphasis supplied.)

Psychological factors play a great part in man's well being and the oppressive impact of long standing and unresolved criminal charges upon a prisoner may well have a debilitating effect both on his health and his potential for rehabilitation. This aspect of the problem is articulately explored in *Smith v. Hooey*, supra, and deserves quotation:

". . . Suffice it to remember that this constitutional guarantee has universally been thought essential to protect at least three basic demands of criminal justice in the Anglo-American legal system: '[1] to prevent undue and oppressive incarceration prior to trial, [2] to minimize anxiety and concern accompanying public accusation and [3] to limit the possibilities that long delay will impair the ability of an accused to defend himself.' *United States v. Ewell*, 383 U.S. 116, 120. These demands are both aggravated and compounded in the case of an accused who is imprisoned by another jurisdiction.

"At first blush it might appear that a man already in prison under a lawful sentence is hardly in a position to suffer from 'undue and oppressive incarceration prior to trial.' But the fact is that delay in bringing such a person to trial on a pending charge may ultimately result in as much oppression as is suffered by one who is jailed without bail upon an untried charge. First, the possibility that the defendant already in prison might receive a sentence at least partially concurrent with the one he is serving may be forever lost if trial of the pending charge is postponed. Secondly, under procedures now widely practiced, the duration of his present imprisonment may be increased, and the conditions under which he must serve his sentence greatly worsened, by the pendency of another criminal charge outstanding against him.

"And while it might be argued that a person already in prison would be less likely than others to be affected by 'anxiety and concern accompanying public accusation,' there is reason to believe that an outstanding untried charge (of which even a convict may, of course, be innocent) can have fully as depressive an effect upon a prisoner as upon a person who is at large. Cf. *Klopfer v. North Carolina*, supra, at 221-222. In the opinion of the former Director of the Federal Bureau of Prisons,

" '[I]t is in their effect upon the prisoner and our attempts to rehabilitate him that detainers are most corrosive. The strain of having to serve a sentence with the uncertain prospect of being taken into the custody of another state

at the conclusion interferes with the prisoner's ability to take maximum advantage of his institutional opportunities. His anxiety and depression may leave him with little inclination toward self-improvement.'" (pp. 377-379.)

The rehabilitative aspect of punishment for crime is predominant in the thinking of many penologists and sociologists these days. The dread of having to face undetermined criminal charges upon release from incarceration, it is said, may prove to be quite damaging to a prisoner's mental health as well as negating efforts to prepare him for adjustment to the outside world, once he re-enters it. Recognition of the harmful effects which a detainer may have upon a prisoner is to be found at the beginning of Article I of the Agreement on Detainers, in these words:

"The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. . . ."

The state argues vigorously that prejudice is not to be presumed from a long lapse of time, alone, but that the burden of establishing prejudice rests upon the accused. Statements to the contrary may be found among the cases involving the speedy trial issue. Moreover, it must be kept in mind that the primary burden is on the courts and prosecutors to assure that cases are brought to trial. (See *Barker v. Wingo*, p. 529.)

But we do not predicate our opinion on a presumption of prejudice arising from lengthy delay, but on a balancing of factors of which prejudice is only one, albeit an important and substantial one. Furthermore, the state's argument assumes that prejudice is important only as it relates to the ability of an accused to make his defense. We have already demonstrated the error of such an assumption. Mr. Justice White put the matter succinctly in *United States v. Marion*, 404 U. S. 307, 320, 30 L. 2d 468, 92 S. Ct. 455, where he said:

". . . [T]he major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. . . ."

Giving consideration to all the circumstances shown to exist in this case we hold that the defendant was deprived of his right to a speedy trial.

The judgment is reversed with directions to sustain the defendant's motion to dismiss the proceedings.