(677 P.2d 554)
No. 55,299

In the Matter of the Application of SESMON SWEAT for a Writ of Habeas Corpus, *Appellant,* v. JOHNNIE DARR, Sheriff of Sedgwick County, Kansas, *Appellee.*

Opinion filed February 2, 1984.

*Eric A. Commer,* of Law Office of Lyle W. Britt, Chtd., of Wichita, for appellant.

*Geary N. Gorup,* assistant district attorney, *Clark V. Owens,* district attorney, and *Robert T. Stephan,* attorney general, for appellee.

Before Rees, P.J., Meyer, J., and Richard W. Wahl, District Judge Assigned.

Rees, J.: This is a habeas corpus proceeding in which petitioner claims that by operation of the interstate Agreement on Detainers (K.S.A. 22-4401 *et seq.*) the Sedgwick County District Court was required to dismiss the criminal charges for which he was being held for trial in that court. The material facts are essentially undisputed. They are almost wholly established by documentary evidence, particularly petitioner's Exhibit 2, and to the extent they are not, they are established by the parties' stipulations.

On November 9, 1982, while in custody at the Sedgwick County jail in Wichita, petitioner applied for a writ of habeas corpus. It was immediately issued. At the conclusion of an evidentiary hearing on November 16, 1982, the trial judge ordered the writ dissolved and that petitioner remain in the sheriff's custody for trial on the Sedgwick County charges. Petitioner appeals.

In early 1982, petitioner was a prisoner in the custody of the California Department of Corrections at the California Rehabilitation Center, Norco, California (CRC). He was serving a two-year sentence imposed following a 1981 California robbery conviction. Using IAD Form I (Notice of Untried Indictment, Information or Complaint and of Right to Request Disposition), the Superintendent of CRC informed petitioner in writing that a detainer had been lodged against him with respect to untried 1981 Sedgwick County drug charges. There is confusion in the documentation of the date petitioner was so informed, but it is clear it occurred not earlier than March 22, 1982, and not later than March 26, 1982. Petitioner signed and gave the custodial officials at CRC an IAD Form II (Inmate's Notice of Place of Imprisonment and Request for Disposition of Indictments, Informations or Complaints). Within it is recited reference to Sedgwick County Case No. 81 CR 305, identical to the same reference appearing in the IAD Form I delivered to the petitioner, and a typewritten insertion of the date of March 24, 1982. A completed IAD Form III (Certificate of Inmate Status) was signed by the Superintendent of CRC and an IAD Form IV (Offer to Deliver Temporary Custody) was executed by or on behalf of the Superintendent of CRC.

As evidenced by the postmark on the envelope used, the four

completed documents, that is, IAD Forms I, II, III and IV, being the notice of untried charges, the written notice of the place of petitioner's imprisonment and request for final disposition of untried charges, the custodial official's certificate and the California authority's offer to deliver temporary custody, together with a form letter, bearing the date of March 26, 1982, and acknowledging receipt of the Sedgwick County detainer, were mailed by CRC to the Sedgwick County Sheriff on March 31, 1982, by certified mail.

The parties agree the documents were received by the sheriff but the particular date of their receipt by him is unknown. None of the documents were delivered by the Sheriff to the clerk or any other officer or employée of the Sedgwick County District Court, or the Sedgwick County District Attorney or any of his assistants or employees. For aught that appears, the documents languished in the sheriff's office from the time he received them until this proceeding was initiated. No copies of any of the documents were mailed by CRC to the Sedgwick County District Court or to the Sedgwick County District Attorney and none were received by either the court or the district attorney's office from petitioner, his attorney, or any other office or person.

Petitioner remained in custody in California on his robbery conviction from March, 1982, to October 27, 1982, when he was returned to Wichita by the Sedgwick County Sheriff upon acceptance of a California offer to deliver temporary custody issued as a result of an August 11, 1982, Article III request for final disposition of untried charges given by petitioner to his then custodial officials at the Soledad, California, Correctional Training Facility. On January 24, 1983, he went to trial on the drug charges. A jury verdict finding him guilty of possession of marijuana was returned on January 27, 1983.

There was never an acceptance by Kansas authorities of California's March, 1982 offer to deliver temporary custody. His return to Kansas was not in response to his March, 1982 disposition of charges request.

Kansas and California are party states to the Interstate Agreement on Detainers (Agreement). K.S.A. 22-4401 *et seq.;* Cal. Penal Code § 1389 *et seq.* (West 1982). It statutorily prescribes speedy trial rights. Article III is applicable to a prisoner's initiation of return for disposition of untried charges. Article IV is

applicable to a requesting state's initiation of return for disposition of untried charges. *State v. White,* 234 Kan. 340, 342, 673 P.2d 1106 (1983). The time limits imposed are 180 days under Article III and 120 days under Article IV. The case before us concerns Article III and its requirement of trial within 180 days. Petitioner argues he was not brought to trial within the 180 days provided in Article III and under Article V it was the mandated duty of the Sedgwick County District Court to dismiss the charges against him in that court. Specifically, Article V provides:

"(a) In response to a request made under article III . . . the appropriate authority in a sending state [California] shall offer to deliver temporary custody of such prisoner to the appropriate authority in the state where such indictment, information or complaint is pending against such person [Kansas] in order that speedy and efficient prosecution may be had. If the request for final disposition is made by the prisoner, the offer of temporary custody shall accompany the written notice provided for in article III of this agreement. . . .

. . . . .

"(c) If the appropriate [Kansas] authority shall refuse or fail to accept temporary custody of said person, or in the event that an action on the indictment, information or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in article III . . . the appropriate court of the jurisdiction where the indictment, information or complaint has been pending shall enter an order dismissing the same with prejudice . . . ."

It is clear that by March 26, 1982, petitioner gave to his California custodial officials his written notice of place of his imprisonment and request for return for disposition of charges. Based on that date, 228 days elapsed until he filed his application for a writ of habeas corpus. If time computation is based upon March 31, 1982, the date of the CRC mailing to the Sedgwick County Sheriff, 223 days elapsed until he filed his application for a writ of habeas corpus.

With the foregoing in mind, we turn to the heart of this litigation. It concerns Articles III(a) and III(b) of the agreement. In pertinent part they read:

"(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, *he shall be brought to trial within one hundred and eighty (180) days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction writ-*

*ten notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint* . . . . The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.

"(b) *The written notice and request for final disposition* referred to in paragraph (a) hereof *shall be given* or sent *by the prisoner to the warden,* commissioner of corrections *or other official having custody of him, who shall promptly forward it* together with the certificate *to the appropriate prosecuting officer and court* by registered or certified mail, return receipt requested." (Emphasis added.)

Simply put, petitioner's argument is that in March, 1982, he complied with Article III and he should not suffer because of the error of others. He says that the Article III(b) provision that the prisoner give his written notice and request to his custodial official defines the Article III(a) event upon the happening of which the prescribed 180-day period commences. In other words, he says that when he gave to his custodial officials his written notice and request, he "caused to be delivered to the prosecuting officer and the appropriate court" his notice and request as provided by Article III(a). Upon this thesis and with particular reference to Article III(b), it is not the prisoner's but his custodial officials' statutory duty to "promptly forward [the notice and request] together with the [custodial officials'] certificate to the appropriate prosecuting officer and court." Applying this argument to the facts of this case and adopting March 26, 1982 as the date petitioner gave his written notice and request to his custodial officials at CRC, dismissal of the drug charges by the Sedgwick County District Court was required on and after September 23, 1982.

The tripartite purpose of the Agreement is stated in its Article I: (1) To reduce uncertainties from outstanding charges and detainers "which obstruct programs of prisoner treatment and rehabilitation"; (2) "to encourage the expeditious and orderly disposition of such charges"; and (3) to provide cooperative procedures applying to such charges for member states. See *United States v. Mauro*, 436 U.S. 340, 351, 56 L.Ed.2d 329, 98 S.Ct. 1834 (1978); *People v. Esposito*, 37 Misc. 2d 386, 391-392, 201 N.Y.S.2d 83 (1960).

A central reason for the Agreement is mitigation of adverse

effects to prisoners of detainers lodged by other states. *People v. Daily,* 46 Ill. App. 3d 195, 360 N.E.2d 1131 (1977). "The necessary result of this practice severely impeded potential rehabilitation for those prisoners laboring under the threat of untried indictments who never knew when, if ever, detaining jurisdictions would cease to toss [them] from one jurisdiction to another. [Citations omitted.]" *Dailey,* 46 Ill. App. 3d at 198-199. Discussing the same hardships, a New York court quotes the following from a legal journal:

" '[A] prison inmate with a detainer filed against him because of outstanding charges in another jurisdiction may suffer several disabilities, ranging from mandatory maximum-security classification to exclusion from vocational rehabilitation programs and even to possible ineligibility for parole.' " *Matter of Baker v. Schubin,* 72 Misc. 2d 413, 416, 339 N.Y.S.2d 360 (1972), quoting Wexler & Hershey, *Criminal Detainers in a Nutshell,* 7 Crim. L. Bull. 753 (1971).

See *Ward v. State,* 435 N.E.2d 578 (Ind. App. 1982).

The Agreement, in an attempt to achieve its purpose, gives the prisoner the power to compel trial or other disposition of outstanding charges in foreign jurisdictions. Article III. What must be done to trigger commencement of the Article III(a) 180-day period is one question confronting us. Another question is the applicability of Article III(b) in answering that question.

Many jurisdictions, including Kansas, have concluded running of the 180-day period requires a prisoner's "substantial compliance" with the Agreement's provisions. See *Ekis, Petitioner v. Darr,* 217 Kan. 817, 824-825, 539 P.2d 16 (1975); *Rockmore v. State,* 21 Ariz. App. 388, 519 P.2d 877 (1974); *McBride v. United States,* 393 A.2d 123, 128 (D.C. 1978); *People v. Daily,* 46 Ill. App. 3d at 205; *State v. Seadin,* 181 Mont. 294, 297, 593 P.2d 451 (1979); *State v. Wells,* 186 N.J. Super. 497, 502, 453 A.2d 236 (1982); *People v. Diaz,* 94 Misc. 2d 1010, 1013-14, 406 N.Y.S.2d 239 (1978). What constitutes "substantial compliance" is where jurisdictions divide.

Article III(a) and (b) of the Agreement also specify obligations of the party states. These duties are nondiscretionary and borne solely by the states. *People v. Wilson,* 69 Cal. App. 3d 631, 138 Cal. Rptr. 259 (1977); *Pittman v. State,* 301 A.2d 509 (Del. 1973); *People v. Daily,* 46 Ill. App. 3d at 201-202; *State ex rel. Saxton v. Moore,* 598 S.W.2d 586, 590 (Mo. App. 1980); *People v. Diaz,* 94 Misc. 2d at 1013-14; *Burns v. State,* 578 S.W.2d 650, 652 (Tenn. Crim. App. 1978). It has been held "[the] prisoner's sole re-

sponsibility under the interstate agreement is to advise the warden of his request for disposition of the charges upon which the detainer is lodged." *People v. Diaz,* 94 Misc. 2d at 1013 (and cases cited therein).

The burden of a state's failure to meet its obligations under the Agreement falls on the prosecution. *Ekis, Petitioner v. Darr,* 217 Kan. at 824; *People v. Wilson,* 69 Cal. App. 3d at 637; *Pittman v. State,* 301 A.2d at 514; *People v. Daily,* 46 Ill. App. 3d at 202; *State v. Seadin,* 181 Mont. at 297. In *Diaz,* a California prisoner sent the appropriate notice and request to the sheriff holding him. The sheriff forwarded it to New York to the proper court clerk, but failed to forward the notice and request to the prosecutor's office. The New York court held:

"In the view of the court here, the adverse effects of an oversight such as occurred in the instant matter must be charged against the prosecution rather than the defendant, who is simply in no position to enforce the procedural terms of the interstate agreement. Clearly, the signatory States, by binding themselves to the compact, have pledged themselves to comply with all of its provisions, thereby rendering themselves agents of each other. If they fail to adhere to their part of the bargain, then New York always retains the option of withdrawing. However, to compel defendant to bear responsibility for the inactions of their custodians is, in effect, to render the law completely meaningless, since the latter would thus be able to thwart at will the rights of their prisoners." 94 Misc. 2d at 1014.

Some jurisdictions, including Kansas, view the 180-day period as commencing only upon receipt of the prisoner's notice and request by the proper authorities in the state which filed the detainer against the prisoner. *State v. White,* 234 Kan. at 344. See *McBride v. United States,* 393 A.2d at 129; *State v. Ternaku,* 156 N.J. Super. 30, 33-34, 383 A.2d 437 (1978); *State v. Arwood,* 46 Or. App. 653, 656, 612 P.2d 763 (1980); Annot., 98 A.L.R.3d 160, 208 § 15 (a). Standing alone, this rule eviscerates Article III(b) of all impact or force. The Agreement's purpose of expediting the disposition of charges could be undermined. For example, a warden could repeatedly refuse to forward a prisoner's request for a speedy trial of the outstanding charges. See *Bursque v. Moore,* 26 Conn. Supp. 469, 227 A.2d 255 (1966). (During six-week period while serving term of imprisonment, prisoner made some 18 written requests to his jailer for a "speedy trial form"; his attorney then sent Article III disposition request form directly to prosecuting attorney and court.) The seriousness of this

situation is aggravated by the rule that pro se or informal requests and notices sent directly to the court or prosecutor do not comply with Article III or activate its provisions. *Ekis, Petitioner v. Darr,* 217 Kan. at 823-825; *State v. Dolack,* 216 Kan. 622, 634, 533 P.2d 1282 (1975); *People v. Cella,* 114 Cal. App. 3d 905, 917, 170 Cal. Rptr. 915 (1981); *People v. Wilson,* 69 Cal. App. 3d at 636-637. In such circumstances, the prisoner is powerless under the Agreement to activate it, and the harms which the Agreement was intended to alleviate are once again present.

In *People v. Wilson,* 69 Cal. App. 3d at 636-638, the consequences of a two-month delay between the prisoner's request to the warden for final disposition and the prosecutor's receipt of the request were addressed. Relying on the general principles that a "prisoner's sole obligation under the Agreement is to advise the warden of his request for final disposition" and that upon the request being made "the burden of compliance with the procedural requirements [rests] upon the party states and their agents," the court concluded the dismissal sanction is proper where a prison official fails to "promptly forward" the prisoner's request. Specifically, the court stated:

"The North Carolina prison authorities took two months to send the certificate and inform the prosecuting authorities of the respondent's request for final disposition of the charges. If this period is found to be unreasonable then the prison officials have failed to meet their statutory duty. The respondent has shown that the initial trial date was not within 180 days of his request to the warden for final disposition; therefore, he is entitled to the benefits of the Agreement if North Carolina's delay in forwarding the certificate is found to be in violation of its duty to promptly forward the information.

"Common sense compels such a conclusion. Both the purpose and the express language of the Agreement are intended to promote the expeditious resolution of detainers. This goal is too easily frustrated if the sending state is not held to its obligation to promptly forward the certificate and inmate request. Absent the implied requirement that this duty will be performed in a reasonable time, an inmate's rights under the Agreement would never mature if the sending state simply failed to comply with article III. We also note that this standard will provide equal protection to those inmates, unlike the respondent, who are unable to pursue their rights under the Agreement by directly communicating with the prosecuting authorities." 69 Cal. App. 3d at 637-638.

*Wilson* was later interpreted to mean "that the 180 days commences upon receipt by the receiving state, any delay between request and receipt to be determined by a reasonableness standard." *People v. Posten,* 108 Cal. App. 3d 633, 640 n. 1, 166 Cal.

Rptr. 661 (1980). California, in effect, construes Article III(b) to prescribe a party state's procedural obligation.

California is not the only jurisdiction giving force and effect to Article III(b). *State v. Ternaku*, 156 N.J. Super. at 34, announced the New Jersey rule to be that the Article III 180-day period commences upon receipt of the request by the prosecutor and the court. But this is not a complete statement of that state's rule. In a later decision involving a nearly three-month delay between the prisoner's filing of his request (April 14) and the warden's fowarding of it (July 9), it is found the New Jersey rule is tempered. *State v. Wells*, 186 N.J. Super. 497. Acknowledging cases holding "that defendants cannot be saddled with the consequences of official misunderstandings or errors," the *Wells* court said:

"The trial judge properly concluded that there had been an 'administrative goof-up'; under the authorities cited above, the 180-day limitation period must be said to have commenced shortly after April 14 and to have expired well before December 15. *State v. Ternaku*, 156 N.J. Super. 30 (App. Div. 1978), certif. den. 77 N.J. 479 (1978), is not to the contrary: *our statement* there *that the IAD documents must be 'delivered to the prosecutor and the appropriate court before the 180-day period starts to run' was upon a showing that the official having custody of defendant had 'promptly forwarded' the documents to the prosecutor and court."* (Emphasis added.) 186 N.J. Super. at 501-502.

The *Wells* decision gives meaning and force to the Article III(b) requirement that a warden promptly forward a prisoner's request. Whether there was compliance with this requirement does not seem to be approached from the standpoint of reasonableness as a condition precedent standard as apparently is done in California. Instead, the 180-day limitation period is held to commence after some short time for the warden to "promptly forward" the request. Nonetheless, the California and New Jersey rules both employ some kind of reasonableness standard in adjudging a sending state's compliance and impose dismissal of the untried charges as the sanction. The only patent distinction is that California does not speak to identification of the 180-day period when addressing the questions of reasonableness and compliance.

Adoption of the New Jersey rule as clarified in *Wells* is not inconsistent with the holding in *State v. White*, 234 Kan. 340, in which our Supreme Court quoted extensively from *State v. Ternaku*, 156 N.J. Super. at 34. In *White*, the date the prisoner gave his request to the prison officials is not mentioned, and the

defendant did not argue that the officials failed to promptly forward the request. The briefs in *White* disclose the time "delay" in question was the four days between the warden's mailing and receipt of the request in Kansas. The *Wells* rule is consistent with *Ternaku* and *White*, and we find no Kansas case authority addressing the question of possible failure to "promptly forward" a prisoner's Article III request for disposition of charges.

In *People v. Bean*, 650 P.2d 565 (Colo. 1982), a prison official's duty to promptly forward a prisoner's request for disposition under the Uniform Mandatory Disposition of Detainers Act is discussed. The court noted:

"A determination of whether the prison officials complied with the Uniform Act requirements must be made on an *ad hoc* basis, with full consideration of factors such as the length and reasons for the delay, the existence of prejudice to the defendant arising from the delay, the knowledge of the delay by prison officials, and their efforts to facilitate transmission of the request after the specific problems resulting in the delay were discovered." 650 P.2d at 568.

These same factors appear employable in a reasonableness determination as to the custodial officials' compliance with their Article III duty to promptly forward a prisoner's request to the receiving state's court and prosecutor.

The existence of some remedy for a prisoner upon a custodial official's failure to "promptly forward" a request insures an official's compliance with Article III(b). In *People v. Esposito*, 37 Misc. 2d at 394, the New York court stated:

"In any case, respect for the purpose of the agreement requires that the adverse consequences of such oversights as here occurred be visited upon the prosecution and not upon the prisoner. In that way the aim of the agreement is subserved by inspiring the officials concerned to gain knowledge of their duties and to perform them diligently and effectively. They are not likely to be so inspired if the prisoner is made the victim of their contributory inaction. There is, of course, no question as to the disposition of the officials in this case to honor the mandates of the law. But there has, obviously, been a failure to appreciate the range of duty and the procedure required by way of its performance."

See *People v. Wilson*, 69 Cal. App. 3d at 637 n. 1.

The receiving state is not unfairly prejudiced by construing Article III(b) in the fashion of *State v. Wells*, 186 N.J. Super. at 501-502. Party states have pledged their compliance to the Agreement and have agreed to cooperate with each other. *People v. Diaz*, 94 Misc. 2d at 1014. Each has agreed to designate an

officer to oversee implementation and operation of the Agreement. Article VII. Article III(a) provides that a court may "grant any necessary or reasonable continuance." Party states are in a better position than prisoners to monitor the performance of each other under the terms of the Agreement. To saddle the prisoner with the burden of insuring a warden's compliance with Article III(b) imposes a burden he cannot assuredly meet and makes possible situations that undermine and frustrate the Agreement's purpose.

At least four jurisdictions apparently follow the rule that the Article III 180-day limitation period unqualifiedly commences upon the prisoner's request to the custodial officials. *United States v. Hutchins,* 489 F. Supp. 710, 715-716 (N.D. Ind. 1980); *Beebe v. State,* 346 A.2d 169, 171 (Del. 1975); *Ward v. State,* ____ 435 N.E.2d at 581; *People v. McBride,* 44 N.Y.2d 1001, 1002, 408 N.Y.S.2d 340, 380 N.E.2d 172 (1978); *State v. Black,* 594 S.W.2d 738, 740-741 (Tenn. Crim. App. 1979); *Burns v. State,* 578 S.W.2d at 651-652. These decisions emphasize that the prisoner's sole obligation is informing the warden and that the prisoner "should not be charged with the responsibility of insuring that his captors have complied with provisions of the law when he has no control over their activities." *Burns v. State,* 578 S.W.2d at 652, quoting *Nelms v. State,* 532 S.W.2d 923, 926-927 (Tenn. 1976). Because this approach, in effect, interprets Article III(b) as the definition of the Article III(a) provision "shall have cause to be delivered," our Supreme Court's holding in *White* is irreconcilable with this interpretation of Article III(a) and (b).

We conclude the record affirmatively establishes petitioner's March, 1982 notice and request was not "promptly forwarded" to the Sedgwick County District Court and the Sedgwick County District Attorney. There was no delay on the part of the responsible California officials. They simply *never* forwarded that notice and request to the Sedgwick County court and prosecutor.

In summary and finding support in the foregoing cases, we hold that Article III(b) imposes a statutory duty upon the warden to promptly forward a prisoner's request for disposition of charges. A trial court, when presented with a claim for dismissal of charges under the terms of Articles III and V of the Agreement and the issue is raised before it, must decide whether the warden

has complied with that duty. If it is found that the warden did not promptly forward the request to the appropriate parties, then the 180-day period of Article III(a) will be held to have commenced some reasonably short time after the prisoner gave his request to the warden. If not more than 180 days has run between the date the prisoner gave his request to the warden and the date the prisoner is brought to trial, whether the warden promptly forwarded the request requires no judicial inquiry and decision.

In the case before us, the State argues the petitioner cannot complain because he brought about the misdirection of the paperwork to the Sedgwick County Sheriff. This argument is founded upon the fact that the March, 1982 notice of place of imprisonment and request for disposition of untried charges (IAD Form II), signed by petitioner, included the following:

"TO: _____Johnnie Darr, Sheriff,_____ Prosecuting Officer _____Douglas R. Roth_____
(jurisdiction)
_____Eighteenth Judicial District,_____ Court _____Sedgwick County_____
(jurisdiction)"

We find the State's argument untenable. The offer to deliver custody (IAD Form IV), executed by the Superintendent of CRC, included the following:

"TO: _____Douglas R. Roth, Assistant District Attorney_____ Prosecuting Officer
Sedgwick County_____
(jurisdiction)"

It is clear to us that when the CRC officials completed the paperwork for forwarding to Kansas, they were neither misled nor confused as to whom it should be sent. They well knew that it was not to be sent to the Sedgwick County Sheriff but instead was to be sent to Douglas R. Roth, an assistant district attorney, and the Sedgwick County District Court.

We deem it unnecessary to directly discuss the State's claim petitioner is not entitled to relief because of his noncompliance with the Agreement. To the extent we may have not said so directly, it is at least implicit in what we have said that it is our conclusion he satisfactorily complied with the Agreement.

Petitioner has made no claim of denial of his constitutional right to a speedy trial. Therefore, that question, addressed in the State's brief, is not before us for resolution.

We find no argument by the State that the fact petitioner was tried within 180 days after his August 11, 1982 request somehow

vitiates his claim on this appeal. If such argument were made, we now perceive no merit in it.

Petitioner's appeal is sustained. The case is remanded to the trial court with instructions to vacate the conviction in Case No. 81 CR 305 and to dismiss the charges therein with prejudice.

MEYER, J.: I dissent.

This appeal involves a proceeding under K.S.A. 60-1501, wherein the district court dissolved a writ of habeas corpus which had previously been issued on behalf of appellant Sesmon Sweat (petitioner).

At issue herein is whether petitioner's first attempt, in March 1982, to comply with the Interstate Agreement on Detainers (K.S.A. 22-4401 *et seq.*, hereinafter, the "Agreement") was sufficient to activate the running of the 180-day provision of that compact. Resolving this issue requires one to determine whether the petitioner or the prosecution must bear the burden of a failed attempt to comply with the provisions of the Agreement.

The applicable provision of the Agreement reads as follows:

"Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty (180) days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint . . . ." K.S.A. 22-4401, Art. III(a).

It is manifestly obvious that petitioner's first notice and request was not actually delivered to the appropriate authorities pursuant to the above-quoted statute, it having been conceded that the sheriff's office, which actually received that request, did not forward it to either the prosecutor or the district court.

This failure to effect delivery on those proper officials was due to the fact that the first request was directed to the wrong addressee. Petitioner relies on the following language in the Agreement to support his argument that it is the responsibility of the officials in the sending state to insure that his request is properly addressed and mailed.

"The written notice and request for final disposition referred to in paragraph

(a) hereof shall be given or sent by the prisoner to the warden, commissioner of corrections or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested." K.S.A. 22-4401, Art. III(b).

The majority have today announced a rule embracing petitioner's argument. I, for one, am philosophically opposed to such a rule, but, additionally, I firmly believe that in several of its opinions the Kansas Supreme Court has made statements which dictate an opposite result.

Kansas law has long cast upon one who seeks to enforce his statutory right to a speedy trial the burden to bring himself squarely within the provisions of the applicable statute through strict compliance with its requirements.

"To obtain the right of a speedy public trial provided by section 10 of our Bill of Rights, as legislatively defined by the Uniform Mandatory Disposition of Detainers Act, it is incumbent upon the accused incarcerated in a penal institution of this state to comply with all provisions of the Act, including the preparation of his written request for disposition of detainer to be addressed to the court in which the indictment, information or complaint is then pending against him and to the county attorney charged with the duty of prosecuting it." *Brimer v. State,* 195 Kan. 107, Syl. ¶ 2, 402 P.2d 789 (1965).

And see also *Townsend v. State,* 215 Kan. 485, Syl. ¶ 3, 524 P.2d 758 (1974).

*Brimer v. State* involved the Uniform Mandatory Disposition of Detainers Act (then K.S.A. 62-2901 *et seq.* (Corrick); now K.S.A. 22-4301 *et seq.*, hereinafter the "Act"). The Act applies to persons who are incarcerated in Kansas; the Agreement applies to persons incarcerated outside this state (or in a federal facility within this state).

The Act and the Agreement have been held to be parallel acts, each providing a legislatively defined protection of the constitutional right to a speedy trial. Those provisions of the Act which are essentially parallel to Art. III(a) and (b) of the Agreement state as follows:

"Any person who is imprisoned in a penal or correctional institution of this state may request final disposition of any untried indictment, information or complaint pending against him in this state. *The request shall be in writing addressed to the court in which the indictment, information or complaint is pending and to the county attorney charged with the duty of prosecuting it,* and shall set forth the place of imprisonment." K.S.A. 22-4301(*a*). (Emphasis added.)

"The request shall be delivered to the warden, superintendent or other officials having custody of the prisoner, who shall forthwith:

. . . .

(2) *send* by registered or certified mail, return receipt requested, one copy of the request and certificate *to the court and* one copy *to the county attorney to whom it is addressed."* K.S.A. 22-4302. (Emphasis added.)

As noted above, in *Brimer v. State*, 195 Kan. 107, the court held that these provisions from the Act operated to cast upon the petitioner the hardship resulting when his notice and request does not reach the appropriate authorities where charges are pending against him.

In *State v. Dolack*, 216 Kan. 622, 533 P.2d 1282 (1975), the parallelism between the Act and the Agreement was noted; there, the court followed the rationale of *Brimer v. State*, and applied that rationale to a case under the Agreement.

"The right of an inmate to a speedy trial who is confined in a penal or correctional institution *in this state*, or confined in a penal or correctional institution *in another state*, is governed solely by the detainer statutes—in the first instance, by the Uniform Mandatory Disposition of Detainers Act (K.S.A. 22-4301 *et seq.*), and in the second instance, by the Agreement on Detainers (K.S.A. 22-4401 *et seq.*). (The second instance includes an inmate who is confined in the United States Penitentiary at Leavenworth, Kansas.)" (Emphasis original.) 216 Kan. 622, Syl. ¶ 4.

"To obtain a speedy trial guaranteed by Section 10 of our Bill of Rights, as legislatively defined by either of the two Acts just referred to, it is incumbent upon an accused incarcerated in a penal institution to comply with all the provisions of the Act applicable to his incarceration, including the preparation of his written request for disposition of detainer to be addressed to the court in which the indictment, information or complaint is then pending against him and to the county attorney charged with the duty of prosecuting it. (*State v. Brooks*, 206 Kan. 418, 479 P.2d 893; *Townsend v. State*, [215 Kan. 485, 524 P.2d 758]; *State v. Otero*, 210 Kan. 530, 502 P.2d 763.)" 216 Kan. at 634.

And in *Ekis, Petitioner v. Darr*, 217 Kan. 817, Syl. ¶ 1, 539 P.2d 16 (1975), the Kansas Supreme Court reaffirmed the foregoing principles:

"The Uniform Mandatory Disposition of Detainers Act (K.S.A. 22-4301 *et seq.*) and the Agreement on Detainers (K.S.A. 22-4401 *et seq.*) are parallel acts designed for the purpose of securing a speedy trial to a defendant incarcerated in a penal institution either in this state or in another state. To invoke the strict 180 day limitation on time of trial under either of the two detainers acts it is incumbent upon an accused to substantially comply with all the provisions of the applicable act."

It is my considered opinion that the central message of *Dolack* and *Ekis* is that one must effectuate actual delivery of one's notice and request upon the appropriate authorities where the

charges are pending in order to claim the speedy trial protections under either the Act or the Agreement. From this premise, it is inferentially deductible that, under both acts, the burden of compliance carries with it the onus resulting when an attempt at compliance is abortive. I find strong support for this inference in the following language from *Ekis:*

> "While we have dealt but little with the Agreement on Detainers we have had numerous cases arising under the Uniform Mandatory Disposition of Detainers Act, K.S.A. 22-4301 *et seq.* In *State v. Dolack,* 216 Kan. 622, 533 P.2d 1282, we recognized the parallel between the two acts, with the Detainers Act applying to prisoners within the state and the Agreement to those in foreign institutions. In *Dolack* we reiterated that 'To obtain a speedy trial guaranteed by Section 10 of our Bill of Rights, as legislatively defined by either of the two Acts just referred to, it is incumbent upon an accused incarcerated in a penal institution to comply with all the provisions of the act applicable to his incarceration.' (p. 634.) Thus, a prisoner may not invoke the strict 180 day limitation of either act if, for example, he sends his motion to the wrong court (*Brimer v. State,* 195 Kan. 107, 402 P.2d 789), or serves the prosecutor but fails to send a copy to the court (*State v. Otero,* 210 Kan. 530, 502 P.2d 763), or files in the proper court but fails to serve the prosecutor (*Townsend v. State,* 215 Kan. 485, 524 P.2d 758)." 217 Kan. at 822-23.

A very recent case which reiterates the principle that an imprisoned defendant must comply with all the provisions of the Agreement in order to invoke its speedy trial protections is *State v. White,* 234 Kan. 340, 673 P.2d 1106 (1983). In that case, the court faced the issue of whether the 180-day speedy trial time limitation contained in Article III of the Agreement commenced upon the prisoner's mailing of his notice and request, or whether those documents must actually be received by the proper authorities in the state which filed the detainer in order to trigger the running of the time period.

In concluding that actual reception of the notice and request by the appropriate officials was required, the court first noted that this result had also been reached by most of the other courts which have addressed the issue. See, *e.g., People v. Bielecki,* 41 Colo. App. 256, 258, 588 P.2d 377 (1978); *State v. Arwood,* 46 Or. App. 653, 655-56, 612 P.2d 763 (1980); *State v. Plant,* 532 S.W.2d 900, 902 (Mo. App. 1976); *State v. Ternaku,* 156 N.J. Super. 30, 34, 383 A.2d 437 (1978); Annot., 98 A.L.R.3d 160, 208 § 15(a), and cases cited therein.

Our Supreme Court then quoted the following statement by the New Jersey Court in *State v. Ternaku,* 156 N.J. Super. at 34:

" 'The language of the statute is explicit. It provides for the commencement of

the 180-day period when defendant has "caused to be delivered to the prosecuting officer and the appropriate court," the written notice and request for final disposition of the pending indictment. The Legislature clearly intended that the documents be delivered to the prosecutor and the appropriate court before the 180-day period starts to run. The period does not start to run upon mere execution and delivery of the notice and request to the warden, commissioner of corrections or other official having custody of defendant. In our view it would be contrary to the public interest to start the running of the 180-day period prior to actual receipt of the notice and request by the prosecutor and the court. If we were to interpret the statute as defendant requests, an indictment would be subject to dismissal each time delivery of the documents to the prosecutor and court is delayed, regardless of cause. We cannot conceive our Legislature as intending such a result by enacting the Interstate Agreement on Detainers. As a matter of fact, had the Legislature intended the 180-day period to begin from the time a defendant delivers the notice and request to the warden, commissioner of corrections or other official having custody over him, it could have so signified by appropriate language.' " *State v. White*, 234 Kan. at 344-45.

After quoting the above, our Supreme Court expressed its opinion as follows:

"We subscribe to this reasoning and believe the result reached effectuates the purpose of the Act. We do not think the legislature intended that prisoners were entitled to dismissal of the charges against them where their request and notice is lost or delayed in the mail. The State should not be required to bring the defendant to trial within 180 days of the time the request was mailed, regardless of when it was received." *State v. White*, 234 Kan. at 345. ·

While the facts in *White* are not directly in point with those in the instant case, and while some of *White's* impact is by way of dicta, I would nevertheless conclude that *White*, especially when considered in conjunction with *Dolack* and *Ekis*, is binding on this court in the instant case. The lesson which emerges from this line of cases is that the protections of the Agreement may be secured only by strict and actual compliance with its notice and request requirements, specifically, that the required documents must be actually received by the proper authorities. Applying this proposition to the case at bar, I would conclude that petitioner has not been denied a speedy trial, as that right is defined by the Agreement.

The majority have today reached a contrary conclusion. As I stated at the outset, I believe my position is supported (if not mandated) by prior decisions of our Supreme Court. But even if I found no such precedent, and thus felt free to fashion a rule of my own design, I would still reject the majority's conclusion.

I agree with my distinguished colleagues in their statements

concerning the purposes to be served by the Agreement. See K.S.A. 22-4401, Art. I, and cases cited in the majority opinion. These purposes are laudable and this judge is, as should be all of the judiciary, committed to their advancement. However, I do not feel that the rule today announced is necessary to the achievement of that end. I also recognize that to protect a right, each wrong must be corrected by a remedy. I believe, though, that the remedy the majority today fashions will do more harm than good.

The majority holds that once a prisoner has delivered his notice and request to the custodial officials in the sending state, he has effected "substantial compliance" with the requirements of the Agreement. From this holding follows the rule that it is this act—delivery of the completed forms to the custodial officials—which unqualifiedly begins the running of the 180-day period of Art. III. While I could embrace this rule in certain situations, I feel that in its application to the facts in the case at bar, the rule has been dangerously expanded.

The majority finds support for its rule in several cases from scattered jurisdictions. To generalize, these cases typically have held that where the custodial officials are guilty of unreasonable delay in the forwarding of a prisoner's notice and request, then such officials have failed to fulfill their statutory duty under Art. III(b) to "promptly forward" those documents. In such a case, the 180-day period of Art. III(a) is held to commence shortly after (or a reasonable time after) the custodial officials received the prisoner's request. Upon reviewing this array of cases, one feature of similarity emerges: most involved charges that the custodial officials were dilatory in meeting their obligations under the Agreement; many also involved allegations of bad faith on the part of those officials. Thus, the operative language of Art. III(b) upon which the various courts based their holdings was the limited duty to "promptly forward" the prisoner's request.

In the instant case, on the other hand, there is no claim of delay on the part of the California officials. The record shows that only five days elapsed between the receipt of petitioner's request and its being forwarded; thus, it cannot be said that those officials did not act "promptly." What the majority here does is increase the scope of the duty owed by the custodial official to include insuring that the request is forwarded "to the appropriate offi-

cials" in the receiving state. This duty as interpreted by the majority, it would seem, includes the positive requirement that the custodial official discover and correct any errors in addressing the request that may have been committed by the prisoner.

The case at bar is not one which cries out for the ultimate sanction of dismissal of the pending charges. Petitioner herein was given timely notice of the detainer lodged against him. When he desired assistance, the California authorities provided it. He also consulted with his own Kansas attorney on initiating proceedings under the Agreement. It appears that petitioner was in control of the preparation of the required forms, so it is he who should properly suffer due to infirmities in the manner same were prepared. The custodial officials should not be made insurers of strict compliance with the Agreement, for to do so would be to invite prisoners to manufacture technical noncompliance in the forms of their request, in the hopes that such actions, disguised as "good-faith attempts at substantial compliance," might reap them a dismissal of charges on speedy trial grounds. It is for all the above reasons that I would not apply the majority's rule to the case at bar.

I believe that the majority's rule places too great a burden on the custodial officials in the sending state. While petitioner herein was confined in a large metropolitan center, if the majority opinion herein is allowed to stand, it will also be applicable and binding in thousands of small towns throughout the nation. Is the custodian in such places, usually the sheriff, expected to shoulder the responsibility of addressing the many forms to the proper places? While, being in the minority, I am unable to nail down the lid on such a potential Pandora's Box, I will at least not help to open it. In addition to my belief that it is wrong, I believe the majority opinion herein is directly contrary to the views of our Supreme Court as expressed in *Dolack, Ekis* and *White*. The trial court's decision herein should have been affirmed.